# CITY OF LOS ANGELES DEPARTMENT OF WATER AND POWER ET AL. *v.* MANHART ET AL.

No. 76–1810.   Argued January 18, 1978—Decided April 25, 1978

STEVENS, J., delivered the opinion of the Court, in which STEWART, WHITE, and POWELL, JJ., joined, in all but Part IV of which MARSHALL, J., joined, and in Part IV of which BURGER, C. J., and BLACKMUN and REHNQUIST, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 723. BURGER, C. J., filed an opinion concurring in part and dissenting in part, in which REHNQUIST, J., joined, *post*, p. 725. MARSHALL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 728. BRENNAN, J., took no part in the consideration or decision of the case.

*David J. Oliphant* argued the cause for petitioners. With him on the briefs were *Burt Pines* and *J. David Hanson.*

*Robert M. Dohrmann* argued the cause for respondents. With him on the brief were *Kenneth M. Schwartz, Laurence D. Steinsapir, Howard M. Knee,* and *Katherine Stoll Burns.**

*Briefs of *amici curiae* urging reversal were filed by *James A. Redden,* Attorney General, *Al J. Laue,* Solicitor General, and *William F. Hoelscher,*

MR. JUSTICE STEVENS delivered the opinion of the Court.

As a class, women live longer than men. For this reason, the Los Angeles Department of Water and Power required its female employees to make larger contributions to its pension fund than its male employees. We granted certiorari to decide whether this practice discriminated against individual female employees because of their sex in violation of § 703 (a)(1) of the Civil Rights Act of 1964, as amended.[1]

For many years the Department[2] has administered retire-

Assistant Attorney General, for the State of Oregon; and by *Harry L. Du Brin, Jr.,* for the New York State Teachers' Retirement System.

Briefs of *amici curiae* urging affirmance were filed by *Solicitor General McCree, Assistant Attorney General Days, Deputy Solicitor General Wallace, Thomas S. Martin, Brian K. Landsberg, Cynthia L. Attwood, Abner W. Sibal, Joseph T. Eddins, Beatrice Rosenberg,* and *Mary-Helen Mautner* for the United States et al.; by *Ruth Bader Ginsburg, Marjorie Mazen Smith,* and *Matthew W. Finkin* for the American Civil Liberties Union et al.; by *Michael Evan Gold* and *Fred Okrand* for the ACLU Foundation of Southern California; by *Jonathan R. Harkavy* for the American Nurses' Assn.; by *Marguerite Rawalt* and *Margaret Young* for the Association for Women in Mathematics et al.; and by *John A. Fillion, Stephen P. Berzon, Fred H. Altshuler, J. Albert Woll,* and *Laurence Gold* for the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America et al.

Briefs of *amici curiae* were filed by *W. Bernard Richland* and *L. Kevin Sheridan* for the city of New York; by *Edward Silver, Larry M. Lavinsky, Stephen E. Tisman,* and *William B. Harman, Jr.,* for the American Council of Life Insurance; by *Lawrence J. Latto* for the Society of Actuaries et al.; and by *William R. Glendon, James B. Weidner,* and *James W. Paul* for the Teachers Insurance and Annuity Association of America et al.

[1] The section provides:

"It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 78 Stat. 255, 42 U. S. C. § 2000e–2 (a)(1).

[2] In addition to the Department itself, the petitioners include members

ment, disability, and death-benefit programs for its employees. Upon retirement each employee is eligible for a monthly retirement benefit computed as a fraction of his or her salary multiplied by years of service.[3] The monthly benefits for men and women of the same age, seniority, and salary are equal. Benefits are funded entirely by contributions from the employees and the Department, augmented by the income earned on those contributions. No private insurance company is involved in the administration or payment of benefits.

Based on a study of mortality tables and its own experience, the Department determined that its 2,000 female employees, on the average, will live a few years longer than its 10,000 male employees. The cost of a pension for the average retired female is greater than for the average male retiree because more monthly payments must be made to the average woman. The Department therefore required female employees to make monthly contributions to the fund which were 14.84% higher than the contributions required of comparable male employees.[4] Because employee contributions were withheld from paychecks, a female employee took home less pay than a male employee earning the same salary.[5]

Since the effective date of the Equal Employment Opportu-

---

of the Board of Commissioners of the Department and members of the plan's Board of Administration.

[3] The plan itself is not in the record. In its brief the Department states that the plan provides for several kinds of pension benefits at the employee's option, and that the most common is a formula pension equal to 2% of the average monthly salary paid during the last year of employment times the number of years of employment. The benefit is guaranteed for life.

[4] The Department contributes an amount equal to 110% of all employee contributions.

[5] The significance of the disparity is illustrated by the record of one woman whose contributions to the fund (including interest on the amount withheld each month) amounted to $18,171.40; a similarly situated male would have contributed only $12,843.53.

nity Act of 1972,[6] the Department has been an employer within the meaning of Title VII of the Civil Rights Act of 1964. See 42 U. S. C. § 2000e (1970 ed., Supp. V). In 1973, respondents[7] brought this suit in the United States District Court for the Central District of California on behalf of a class of women employed or formerly employed by the Department. They prayed for an injunction and restitution of excess contributions.

While this action was pending, the California Legislature enacted a law prohibiting certain municipal agencies from requiring female employees to make higher pension fund contributions than males.[8] The Department therefore amended its plan, effective January 1, 1975. The current plan draws no distinction, either in contributions or in benefits, on the basis of sex. On a motion for summary judgment, the District Court held that the contribution differential violated § 703 (a)(1) and ordered a refund of all excess contributions made before the amendment of the plan.[9] The United States Court of Appeals for the Ninth Circuit affirmed.[10]

The Department and various *amici curiae* contend that: (1) the differential in take-home pay between men and women was not discrimination within the meaning of § 703 (a)(1) because it was offset by a difference in the value of the pension benefits provided to the two classes of employees; (2) the differential was based on a factor "other than sex"

---

[6] 86 Stat. 103 (effective Mar. 24, 1972).

[7] In addition to five individual plaintiffs, respondents include the individuals' union, the International Brotherhood of Electrical Workers, Local Union No. 18.

[8] See Cal. Govt. Code Ann. § 7500 (West Supp. 1978).

[9] The court had earlier granted a preliminary injunction. 387 F. Supp. 980 (1975).

[10] 553 F. 2d 581 (1976). Two weeks after the Ninth Circuit decision, this Court decided *General Electric Co.* v. *Gilbert*, 429 U. S. 125. In response to a petition for rehearing, a majority of the Ninth Circuit panel concluded that its original decision did not conflict with *Gilbert*. 553 F. 2d, at 592 (1977). Judge Kilkenny dissented. *Id.*, at 594.

within the meaning of the Equal Pay Act of 1963 and was therefore protected by the so-called Bennett Amendment;[11] (3) the rationale of *General Electric Co.* v. *Gilbert*, 429 U. S. 125, requires reversal; and (4) in any event, the retroactive monetary recovery is unjustified. We consider these contentions in turn.

## I

There are both real and fictional differences between women and men. It is true that the average man is taller than the average woman; it is not true that the average woman driver is more accident prone than the average man.[12] Before the Civil Rights Act of 1964 was enacted, an employer could fashion his personnel policies on the basis of assumptions about the differences between men and women, whether or not the assumptions were valid.

It is now well recognized that employment decisions cannot be predicated on mere "stereotyped" impressions about the characteristics of males or females.[13] Myths and purely habitual assumptions about a woman's inability to perform certain kinds of work are no longer acceptable reasons for refusing to employ qualified individuals, or for paying them less. This case does not, however, involve a fictional difference between men and women. It involves a generalization that the parties accept as unquestionably true: Women, as a class, do live longer than men. The Department treated its women employees differently from its men employees because the two

---

[11] See nn. 22 and 23, *infra*.

[12] See Developments in the Law, Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv. L. Rev. 1109, 1174 (1971).

[13] "In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes. Section 703 (a) (1) subjects to scrutiny and eliminates such irrational impediments to job opportunities and enjoyment which have plagued women in the past." *Sprogis* v. *United Air Lines, Inc.*, 444 F. 2d 1194, 1198 (CA7 1971).

classes are in fact different. It is equally true, however, that all individuals in the respective classes do not share the characteristic that differentiates the average class representatives. Many women do not live as long as the average man and many men outlive the average woman. The question, therefore, is whether the existence or nonexistence of "discrimination" is to be determined by comparison of class characteristics or individual characteristics. A "stereotyped" answer to that question may not be the same as the answer that the language and purpose of the statute command.

The statute makes it unlawful "to discriminate against any *individual* with respect to his compensation, terms, conditions, or privileges of employment, because of such *individual's* race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–2 (a)(1) (emphasis added). The statute's focus on the individual is unambiguous. It precludes treatment of individuals as simply components of a racial, religious, sexual, or national class. If height is required for a job, a tall woman may not be refused employment merely because, on the average, women are too short. Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply.

That proposition is of critical importance in this case because there is no assurance that any individual woman working for the Department will actually fit the generalization on which the Department's policy is based. Many of those individuals will not live as long as the average man. While they were working, those individuals received smaller paychecks because of their sex, but they will receive no compensating advantage when they retire.

It is true, of course, that while contributions are being collected from the employees, the Department cannot know which individuals will predecease the average woman. Therefore, unless women as a class are assessed an extra charge, they will be subsidized, to some extent, by the class of male

employees.[14]   It follows, according to the Department, that fairness to its class of male employees justifies the extra assessment against all of its female employees.

But the question of fairness to various classes affected by the statute is essentially a matter of policy for the legislature to address.   Congress has decided that classifications based on sex, like those based on national origin or race, are unlawful. Actuarial studies could unquestionably identify differences in life expectancy based on race or national origin, as well as sex.[15] But a statute that was designed to make race irrelevant in the employment market, see *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 436, could not reasonably be construed to permit a take-home-pay differential based on a racial classification.[16]

Even if the statutory language were less clear, the basic policy of the statute requires that we focus on fairness to individuals rather than fairness to classes.   Practices that classify employees in terms of religion, race, or sex tend to preserve traditional assumptions about groups rather than thoughtful scrutiny of individuals.   The generalization involved in this case illustrates the point.   Separate mortality tables are easily interpreted as reflecting innate differences between the sexes; but a significant part of the longevity

---

[14] The size of the subsidy involved in this case is open to doubt, because the Department's plan provides for survivors' benefits.   Since female spouses of male employees are likely to have greater life expectancies than the male spouses of female employees, whatever benefits men lose in "primary" coverage for themselves, they may regain in "secondary" coverage for their wives.

[15] For example, the life expectancy of a white baby in 1973 was 72.2 years; a nonwhite baby could expect to live 65.9 years, a difference of 6.3 years.   See Public Health Service, IIA Vital Statistics of the United States, 1973, Table 5–3.

[16] Fortifying this conclusion is the fact that some States have banned higher life insurance rates for blacks since the 19th century.   See generally M. James, The Metropolitan Life—A Study in Business Growth 338–339 (1947).

differential may be explained by the social fact that men are heavier smokers than women.[17]

Finally, there is no reason to believe that Congress intended a special definition of discrimination in the context of employee group insurance coverage. It is true that insurance is concerned with events that are individually unpredictable, but that is characteristic of many employment decisions. Individual risks, like individual performance, may not be predicted by resort to classifications proscribed by Title VII. Indeed, the fact that this case involves a group insurance program highlights a basic flaw in the Department's fairness argument. For when insurance risks are grouped, the better risks always subsidize the poorer risks. Healthy persons subsidize medical benefits for the less healthy; unmarried workers subsidize the pensions of married workers;[18] persons who eat, drink, or smoke to excess may subsidize pension benefits for persons whose habits are more temperate. Treating different classes of risks as though they were the same for purposes of group insurance is a common practice that has never been considered inherently unfair. To insure the flabby and the fit as though they were equivalent risks may be more common than treating men and women alike;[19] but nothing more than habit makes one "subsidy" seem less fair than the other.[20]

---

[17] See R. Retherford, The Changing Sex Differential in Mortality 71–82 (1975). Other social causes, such as drinking or eating habits—perhaps even the lingering effects of past employment discrimination—may also affect the mortality differential.

[18] A study of life expectancy in the United States for 1949–1951 showed that 20-year-old men could expect to live to 60.6 years of age if they were divorced. If married, they could expect to reach 70.9 years of age, a difference of more than 10 years. *Id.*, at 93.

[19] The record indicates, however, that the Department has funded its death-benefit plan by equal contributions from male and female employees. A death benefit—unlike a pension benefit—has less value for persons with longer life expectancies. Under the Department's concept of fairness, then, this neutral funding of death benefits is unfair to women as a class.

[20] A variation on the Department's fairness theme is the suggestion that

An employment practice that requires 2,000 individuals to contribute more money into a fund than 10,000 other employees simply because each of them is a woman, rather than a man, is in direct conflict with both the language and the policy of the Act. Such a practice does not pass the simple test of whether the evidence shows "treatment of a person in a manner which but for that person's sex would be different." [21] It constitutes discrimination and is unlawful unless exempted by the Equal Pay Act of 1963 or some other affirmative justification.

## II

Shortly before the enactment of Title VII in 1964, Senator Bennett proposed an amendment providing that a compensation differential based on sex would not be unlawful if it was authorized by the Equal Pay Act, which had been passed a year earlier.[22] The Equal Pay Act requires employers to pay

a gender-neutral pension plan would itself violate Title VII because of its disproportionately heavy impact on male employees. Cf. *Griggs* v. *Duke Power Co.*, 401 U. S. 424. This suggestion has no force in the sex discrimination context because each retiree's total pension benefits are ultimately determined by his *actual life span;* any differential in benefits paid to men and women in the aggregate is thus "based on [a] factor other than sex," and consequently immune from challenge under the Equal Pay Act, 29 U. S. C § 206 (d); cf. n 24, *infra.* Even under Title VII itself—assuming disparate-impact analysis applies to fringe benefits, cf. *Nashville Gas Co.* v. *Satty,* 434 U. S. 136, 144–145—the male employees would not prevail. Even a completely neutral practice will inevitably have *some* disproportionate impact on one group or another. *Griggs* does not imply, and this Court has never held, that discrimination must always be inferred from such consequences.

[21] Developments in the Law, *supra* n. 12, at 1170; see also *Sprogis* v. *United Air Lines, Inc.,* 444 F. 2d, at 1205 (Stevens, J., dissenting).

[22] The Bennett Amendment became part of § 703 (h), which provides in part:

"It shall not be an unlawful employment practice under this title for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section

members of both sexes the same wages for equivalent work, except when the differential is pursuant to one of four specified exceptions.[23] The Department contends that the fourth exception applies here. That exception authorizes a "differential based on any other factor other than sex."

The Department argues that the different contributions exacted from men and women were based on the factor of longevity rather than sex. It is plain, however, that any individual's life expectancy is based on a number of factors, of which sex is only one. The record contains no evidence that any factor other than the employee's sex was taken into account in calculating the 14.84% differential between the respective contributions by men and women. We agree with Judge Duniway's observation that one cannot "say that an

---

6 (d) of the Fair Labor Standards Act of 1938, as amended (29 U. S. C. § 206 (d))." 78 Stat. 257, 42 U. S. C. § 2000e–2 (h).

[23] The Equal Pay Act provides, in part:

"No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." 77 Stat. 56, 29 U. S. C. § 206 (d).

We need not decide whether retirement benefits or contributions to benefit plans are "wages" under the Act, because the Bennett Amendment extends the Act's four exceptions to all forms of "compensation" covered by Title VII. See n. 22, *supra*. The Department's pension benefits, and the contributions that maintain them, are "compensation" under Title VII. Cf. *Peters* v. *Missouri-Pacific R. Co.*, 483 F. 2d 490, 492 n. 3 (CA5 1973), cert. denied, 414 U. S. 1002.

actuarial distinction based entirely on sex is 'based on any other factor other than sex.' Sex is exactly what it is based on." 553 F. 2d 581, 588, (1976).[24]

We are also unpersuaded by the Department's reliance on a colloquy between Senator Randolph and Senator Humphrey during the debate on the Civil Rights Act of 1964. Commenting on the Bennett Amendment, Senator Humphrey expressed his understanding that it would allow many differences in the treatment of men and women under industrial benefit plans, including earlier retirement options for women.[25]

---

[24] The Department's argument is specious because its contribution schedule distinguished only imperfectly between long-lived and short-lived employees, while distinguishing precisely between male and female employees. In contrast, an entirely gender-neutral system of contributions and benefits would result in differing retirement benefits precisely "based on" longevity, for retirees with long lives would always receive more money than comparable employees with short lives. Such a plan would also distinguish in a crude way between male and female pensioners, because of the difference in their average life spans. It is this sort of disparity—and not an explicitly gender-based differential—that the Equal Pay Act intended to authorize.

[25] "MR. RANDOLPH. Mr. President, I wish to ask of the Senator from Minnesota [Mr. Humphrey], who is the effective manager of the pending bill, a clarifying question on the provisions of title VII.

"I have in mind that the social security system, in certain respects, treats men and women differently. For example, widows' benefits are paid automatically; but a widower qualifies only if he is disabled or if he was actually supported by his deceased wife. Also, the wife of a retired employee entitled to social security receives an additional old age benefit; but the husband of such an employee does not. These differences in treatment as I recall, are of long standing.

"Am I correct, I ask the Senator from Minnesota, in assuming that similar differences of treatment in industrial benefit plans, including earlier retirement options for women, may continue in operation under this bill, if it becomes law?

"MR. HUMPHREY. Yes. That point was made unmistakably clear earlier today by the adoption of the Bennett amendment; so there can be no doubt about it." 110 Cong. Rec. 13663–13664 (1964).

Though he did not address differences in employee contributions based on sex, Senator Humphrey apparently assumed that the 1964 Act would have little, if any, impact on existing pension plans. His statement cannot, however, fairly be made the sole guide to interpreting the Equal Pay Act, which had been adopted a year earlier; and it is the 1963 statute, with its exceptions, on which the Department ultimately relies. We conclude that Senator Humphrey's isolated comment on the Senate floor cannot change the effect of the plain language of the statute itself.[26]

### III

The Department argues that reversal is required by *General Electric Co.* v. *Gilbert,* 429 U. S. 125. We are satisfied,

---

[26] The administrative constructions of this provision look in two directions. The Wage and Hour Administrator, who is charged with enforcing the Equal Pay Act, has never expressly approved different *employee* contribution rates, but he has said that either equal employer contributions or equal benefits will satisfy the Act. 29 CFR § 800.116 (d) (1977). At the same time, he has stated that a wage differential based on differences in the average costs of employing men and women is not based on a " 'factor other than sex.' " 29 CFR § 800.151 (1977). The Administrator's reasons for the second ruling are illuminating:

"To group employees solely on the basis of sex for purposes of comparison of costs necessarily rests on the assumption that the sex factor alone may justify the wage differential—an assumption plainly contrary to the terms and purpose of the Equal Pay Act. Wage differentials so based would serve only to perpetuate and promote the very discrimination at which the Act is directed, because in any grouping by sex of the employees to which the cost data relates, the group cost experience is necessarily assessed against an individual of one sex without regard to whether it costs an employer more or less to employ such individual than a particular individual of the opposite sex under similar working conditions in jobs requiring equal skill, effort, and responsibility." *Ibid.*

To the extent that they conflict, we find that the reasoning of § 800.151 has more "power to persuade" than the *ipse dixit* of § 800.116. Cf. *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140.

however, that neither the holding nor the reasoning of *Gilbert* is controlling.

In *Gilbert* the Court held that the exclusion of pregnancy from an employer's disability benefit plan did not constitute sex discrimination within the meaning of Title VII. Relying on the reasoning in *Geduldig* v. *Aiello,* 417 U. S. 484, the Court first held that the General Electric plan did not involve "discrimination based upon gender as such." [27] The two groups of potential recipients which that case concerned were pregnant women and nonpregnant persons. " 'While the first group is exclusively female, the second includes members of both sexes.' " 429 U. S., at 135. In contrast, each of the two groups of employees involved in this case is composed entirely and exclusively of members of the same sex. On its face, this plan discriminates on the basis of sex whereas the General Electric plan discriminated on the basis of a special physical disability.

In *Gilbert* the Court did note that the plan as actually administered had provided more favorable benefits to women as a class than to men as a class.[28] This evidence supported the conclusion that not only had plaintiffs failed to establish a prima facie case by proving that the plan was discriminatory

---

[27] Quoting from the *Geduldig* opinion, the Court stated:

" '[T]his case is thus a far cry from cases like *Reed* v. *Reed,* 404 U. S. 71 (1971), and *Frontiero* v. *Richardson,* 411 U. S. 677 (1973), involving discrimination based upon gender as such. The California insurance program does not exclude anyone .from benefit eligibility because of gender but merely removes one physical condition—pregnancy—from the list of compensable disabilities.' " 429 U. S., at 134.

After further quotation, the Court added:

"The quoted language from *Geduldig* leaves no doubt that our reason for rejecting appellee's equal protection claim in that case was that the exclusion of pregnancy from coverage under California's disability-benefits plan was not in itself discrimination based on sex." *Id.,* at 135.

[28] See *id.,* at 130–131, n. 9.

on its face, but they had also failed to prove any discriminatory effect.[29]

In this case, however, the Department argues that the absence of a discriminatory effect on women as a class justifies an employment practice which, on its face, discriminated against individual employees because of their sex. But even if the Department's actuarial evidence is sufficient to prevent plaintiffs from establishing a prima facie case on the theory that the effect of the practice on women as a class was discriminatory, that evidence does not defeat the claim that the practice, on its face, discriminated against every individual woman employed by the Department.[30]

In essence, the Department is arguing that the prima facie showing of discrimination based on evidence of different contributions for the respective sexes is rebutted by its demonstration that there is a like difference in the cost of providing benefits for the respective classes. That argument might prevail if Title VII contained a cost-justification defense comparable to the affirmative defense available in a price dis-

---

[29] As the Court recently noted in *Nashville Gas Co.* v. *Satty*, 434 U. S., at 144, the *Gilbert* holding "did not depend on this evidence." Rather, the holding rested on the plaintiff's failure to prove either facial discrimination or discriminatory effect.

[30] Some *amici* suggest that the Department's discrimination is justified by business necessity. They argue that, if no gender distinction is drawn, many male employees will withdraw from the plan, or even the Department, because they can get a better pension plan in the private market. But the Department has long required equal contributions to its death-benefit plan, see n. 19, *supra*, and since 1975 it has required equal contributions to its pension plan. Yet the Department points to no "adverse selection" by the affected employees, presumably because an employee who wants to leave the plan must also leave his job, and few workers will quit because one of their fringe benefits could theoretically be obtained at a marginally lower price on the open market. In short, there has been no showing that sex distinctions are reasonably necessary to the normal operation of the Department's retirement plan.

crimination suit.[31]   But neither Congress nor the courts have recognized such a defense under Title VII.[32]

Although we conclude that the Department's practice violated Title VII, we do not suggest that the statute was intended to revolutionize the insurance and pension industries. All that is at issue today is a requirement that men and women make unequal contributions to an employer-operated pension fund.   Nothing in our holding implies that it would be unlawful for an employer to set aside equal retirement contributions for each employee and let each retiree purchase the largest benefit which his or her accumulated contributions could com-

---

[31] See 15 U. S. C. § 13 (a) (1976 ed.).   Under the Robinson-Patman Act, proof of cost differences justifies otherwise illegal price discrimination; it does not negate the existence of the discrimination itself.   See *FTC* v. *Morton Salt Co.*, 334 U. S. 37, 44–45.   So here, even if the contribution differential were based on a sound and well-recognized business practice, it would nevertheless be discriminatory, and the defendant would be forced to assert an affirmative defense to escape liability.

[32] Defenses under Title VII and the Equal Pay Act are considerably narrower.   See, *e. g.*, n. 30, *supra*.   A broad cost-differential defense was proposed and rejected when the Equal Pay Act became law.   Representative Findley offered an amendment to the Equal Pay Act that would have expressly authorized a wage differential tied to the "ascertainable and specific added cost resulting from employment of the opposite sex." 109 Cong. Rec. 9217 (1963).   He pointed out that the employment of women might be more costly because of such matters as higher turnover and state laws restricting women's hours.   *Id.*, at 9205.   The Equal Pay Act's supporters responded that any cost differences could be handled by focusing on the factors other than sex which actually caused the differences, such as absenteeism or number of hours worked.   The amendment was rejected as largely redundant for that reason.   *Id.*, at 9217.

The Senate Report, on the other hand, does seem to assume that the statute may recognize a very limited cost defense, based on "all of the elements of the employment costs of both men and women."   S. Rep. No. 176, 88th Cong., 1st Sess., 4 (1963).   It is difficult to find language in the statute supporting even this limited defense; in any event, no defense based on the *total* cost of employing men and women was attempted in this case.

mand in the open market.[33] Nor does it call into question the insurance industry practice of considering the composition of an employer's work force in determining the probable cost of a retirement or death benefit plan.[34] Finally, we recognize that in a case of this kind it may be necessary to take special care in fashioning appropriate relief.

## IV

The Department challenges the District Court's award of retroactive relief to the entire class of female employees and retirees. Title VII does not require a district court to grant any retroactive relief. A court that finds unlawful discrimination "may enjoin [the discrimination] . . . and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement . . . with or without back pay . . . or any other equitable relief as the court deems appropriate." 42 U. S. C. § 2000e–5 (g) (1970 ed., Supp. V).

[33] Title VII and the Equal Pay Act primarily govern relations between employees and their employer, not between employees and third parties. We do not suggest, of course, that an employer can avoid his responsibilities by delegating discriminatory programs to corporate shells. Title VII applies to "any agent" of a covered employer, 42 U. S. C. § 2000e (b) (1970 ed., Supp. V), and the Equal Pay Act applies to "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U. S. C. § 203 (d). In this case, for example, the Department could not deny that the administrative board was its agent after it successfully argued that the two were so inseparable that both shared the city's immunity from suit under 42 U. S. C. § 1983.

[34] Title VII bans discrimination against an "individual" because of "such individual's" sex. 42 U. S. C. § 2000e–2 (a) (1). The Equal Pay Act prohibits discrimination "within any establishment," and discrimination is defined as "paying wages to employees . . . at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex" for equal work. 29 U. S. C. § 206 (d) (1). Neither of these provisions makes it unlawful to determine the funding requirements for an establishment's benefit plan by considering the composition of the entire force.

To the point of redundancy, the statute stresses that retroactive relief "may" be awarded if it is "appropriate."

In *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, the Court reviewed the scope of a district court's discretion to fashion appropriate remedies for a Title VII violation and concluded that "backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Id.,* at 421. Applying that standard, the Court ruled that an award of backpay should not be conditioned on a showing of bad faith. *Id.,* at 422–423. But the *Albemarle* Court also held that backpay was not to be awarded automatically in every case.[35]

The *Albemarle* presumption in favor of retroactive liability can seldom be overcome, but it does not make meaningless the district courts' duty to determine that such relief is appropriate. For several reasons, we conclude that the District Court gave insufficient attention to the equitable nature of Title VII remedies.[36] Although we now have no doubt about

[35] Specifically, the Court held that a defendant prejudiced by his reliance on a plaintiff's initial waiver of any backpay claims could be absolved of backpay liability by a district court. 422 U. S., at 424. The Court reserved the question whether reliance of a different kind—on state "protective" laws requiring sex differentiation—would also save a defendant from liability. *Id.,* at 423 n. 18.

[36] According to the District Court, the defendant's liability for contributions did not begin until April 5, 1972, the day the Equal Employment Opportunity Commission issued an interpretation casting doubt on some varieties of pension fund discrimination. See 37 Fed. Reg. 6835–6837. Even assuming that the EEOC's decision should have put the defendants on notice that they were acting illegally, the date chosen by the District Court was too early. The court should have taken into account the difficulty of amending a major pension plan, a task that cannot be accomplished overnight. Moreover, it should not have given conclusive weight to the EEOC guideline. See *General Electric Co.* v. *Gilbert,* 429 U. S., at 141. The Wage and Hour Administrator, whose rulings also provide a

720

the application of the statute in this case, we must recognize that conscientious and intelligent administrators of pension funds, who did not have the benefit of the extensive briefs and arguments presented to us, may well have assumed that a program like the Department's was entirely lawful. The courts had been silent on the question, and the administrative agencies had conflicting views.[37] The Department's failure to act more swiftly is a sign, not of its recalcitrance, but of the problem's complexity. As commentators have noted, pension administrators could reasonably have thought it unfair—or even illegal—to make male employees shoulder more than their "actuarial share" of the pension burden.[38] There is no

---

defense in sex discrimination cases, 29 U. S. C. § 259, refused to follow the EEOC. See n. 37, *infra*.

Further doubt about the District Court's equitable sensitivity to the impact of a refund order is raised by the court's decision to award the full difference between the contributions made by male employees and those made by female employees. This may give the victims of the discrimination more than their due. If an undifferentiated actuarial table had been employed in 1972, the contributions of women employees would no doubt have been lower than they were, but they would not have been as low as the contributions actually made by men in that period. The District Court should at least have considered ordering a refund of only the difference between contributions made by women and the contributions they would have made under an actuarially sound and nondiscriminatory plan.

[37] As noted earlier, n. 26, *supra*, the position of the Wage and Hour Administrator has been somewhat confusing. His general rule rejected differences in average cost as a defense, but his more specific rule lent some support to the Department's view by simply requiring an employer to equalize either his contributions or employee benefits. Compare 29 CFR § 800.151 (1977) with § 800.116 (d). The EEOC requires equal benefits. See 29 CFR §§ 1604.9 (e) and (f) (1977). Two other agencies with responsibility for equal opportunity in employment adhere to the Wage and Hour Administrator's position. See 41 CFR § 60.20.3 (c) (1977) (Office of Federal Contract Compliance); 45 CFR § 86.56 (b)(2) (1976) (Dept. of Health, Education, and Welfare). See also 40 Fed. Reg. 24135 (1975) (HEW).

[38] "If an employer establishes a pension plan, the charges of discrimination will be reversed: if he chooses a money purchase formula, women can complain that they receive less per month. While the employer and the

reason to believe that the threat of a backpay award is needed to cause other administrators to amend their practices to conform to this decision.

Nor can we ignore the potential impact which changes in rules affecting insurance and pension plans may have on the economy. Fifty million Americans participate in retirement plans other than Social Security. The assets held in trust for these employees are vast and growing—more than $400 billion was reserved for retirement benefits at the end of 1976 and reserves are increasing by almost $50 billion a year.[39] These plans, like other forms of insurance, depend on the accumulation of large sums to cover contingencies. The amounts set aside are determined by a painstaking assessment of the insurer's likely liability. Risks that the insurer foresees will be included in the calculation of liability, and the rates or contributions charged will reflect that calculation. The occurrence of major unforeseen contingencies, however, jeopardizes the insurer's solvency and, ultimately, the insureds' benefits. Drastic changes in the legal rules governing pension and insurance funds, like other unforeseen events, can have this effect. Consequently, the rules that apply to these funds should not be applied retroactively unless the legislature has plainly commanded that result.[40] The EEOC

---

insurance company are quick to point out that women as a group actually receive more when equal contributions are made—because of the long-term effect of compound interest—women employees still complain of discrimination. If the employer chooses the defined benefit formula, his male employees can allege discrimination because he contributes more for women as a group than for men as a group. The employer is in a dilemma: he is damned in the discrimination context no matter what he does." Note, Sex Discrimination and Sex-Based Mortality Tables, 53 B. U. L. Rev. 624, 633–634 (1973) (footnotes omitted).

[39] American Council of Life Insurance, Pension Facts 1977, pp. 20–23.

[40] In 1974, Congress underlined the importance of making only gradual and prospective changes in the rules that govern pension plans. In that year, Congress passed a bill regulating employee retirement programs. Employee Retirement Income Security Act of 1974, 88 Stat. 829. The bill

itself has recognized that the administrators of retirement plans must be given time to adjust gradually to Title VII's demands.[41] Courts have also shown sensitivity to the special dangers of retroactive Title VII awards in this field. See *Rosen* v. *Public Serv. Elec. & Gas Co.,* 328 F. Supp. 454, 466–468 (NJ 1971).

There can be no doubt that the prohibition against sex-differentiated employee contributions represents a marked departure from past practice. Although Title VII was enacted in 1964, this is apparently the first litigation challenging contribution differences based on valid actuarial tables. Retroactive liability could be devastating for a pension fund.[42] The

---

paid careful attention to the problem of retroactivity. It set a wide variety of effective dates for different provisions of the new law; some of the rules will not be fully effective until 1984, a decade after the law was enacted. See, *e. g.,* in 1970 ed., Supp. V of 29 U. S. C., § 1061 (a) (Sept. 2, 1974); § 1031 (b)(1) (Jan. 1, 1975); § 1086 (b) (Dec. 31, 1975); § 1114 (c)(4) (June 30, 1977); § 1381 (c)(1) (Jan. 1, 1978); § 1061 (c) (Dec. 31, 1980); § 1114 (c) (June 30, 1984).

[41] In February 1968, the EEOC issued guidelines disapproving differences in male and female retirement ages. In September of the same year, EEOC's general counsel gave an opinion that retirement plans could set gradual schedules for complying with the guidelines and that the judgment of the parties about how speedily to comply "would carry considerable weight." See *Chastang* v. *Flynn & Emrich Co.,* 541 F. 2d 1040, 1045 (CA4 1976).

[42] The plaintiffs assert that the award in this case would not be crippling to these defendants, because it is limited to contributions between 1972 and 1975. But we cannot base a ruling on the facts of this case alone. As this Court noted in *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, equitable remedies may be flexible but they still must be founded on principle. "Important national goals would be frustrated by a regime of discretion that 'produce[d] different results for breaches of duty in situations that cannot be differentiated in policy.'" *Id.,* at 417. Employers are not liable for improper contributions made more than two years before a charge was filed with the EEOC. 42 U. S. C. § 2000e–5 (g) (1970 ed., Supp. V). But it is not unusual for cases to remain within the EEOC for years after a charge is filed, see, *e. g., Occidental Life Ins. Co.* v. *EEOC,* 432 U. S. 355 (3 years, 2 months), and that delay is but a prelude to the time inevitably consumed in civil litigation.

harm would fall in large part on innocent third parties. If, as the courts below apparently contemplated, the plaintiffs' contributions are recovered from the pension fund,[43] the administrators of the fund will be forced to meet unchanged obligations with diminished assets.[44] If the reserve proves inadequate, either the expectations of all retired employees will be disappointed or current employees will be forced to pay not only for their own future security but also for the unanticipated reduction in the contributions of past employees.

Without qualifying the force of the *Albemarle* presumption in favor of retroactive relief, we conclude that it was error to grant such relief in this case. Accordingly, although we agree with the Court of Appeals' analysis of the statute, we vacate its judgment and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE BRENNAN took no part in the consideration or decision of this case.

MR. JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

MR. JUSTICE STEWART wrote the opinion for the Court in *Geduldig* v. *Aiello,* 417 U. S. 484 (1974), and joined the Court's opinion in *General Electric Co.* v. *Gilbert,* 429 U. S. 125

---

[43] The Court of Appeals plainly expected the plan to pay the award, for it noted that imposing retroactive liability "might leave the plan somewhat under-funded." 553 F. 2d, at 592. After making this observation, the Court of Appeals suggested a series of possible solutions to the problem—the benefits of all retired workers could be lowered, the burden on current employees could be increased, or the Department could decide to contribute enough to offset the plan's unexpected loss. *Ibid.*

[44] Two commentators urging the illegality of gender-based pension plans noted the danger of "staggering damage awards," and they proposed as one cure the exercise of judicial "discretion [to] refuse a back-pay award because of the hardship it would work on an employer who had acted in good faith . . . ." Bernstein & Williams, Title VII and the Problem of Sex Classifications in Pension Programs, 74 Colum. L. Rev. 1203, 1226, 1227 (1974).

(1976). Mr. Justice White and Mr. Justice Powell joined both *Geduldig* and *General Electric*. Mr. Justice Stevens, who writes the opinion for the Court in the present case, dissented in *General Electric*. 429 U. S., at 160. Mr. Justice Marshall, who joins the Court's opinion in large part here, joined the dissent in both *Geduldig* and *General Electric*. 417 U. S., at 497; 429 U. S., at 146. My own discomfort with the latter case was apparent, I believe, from my separate concurrence there. *Ibid.*

These "lineups" surely are not without significance. The participation of my Brothers Stewart, White, and Powell in today's majority opinion *should* be a sign that the decision in this case is not in tension with *Geduldig* and *General Electric* and, indeed, is wholly consistent with them. I am not at all sure that this is so; the votes of Mr. Justice Marshall and Mr. Justice Stevens would indicate quite the contrary.

Given the decisions in *Geduldig* and *General Electric*—the one constitutional, the other statutory—the present case just cannot be an easy one for the Court. I might have thought that those decisions would have required the Court to conclude that the critical difference in the Department's pension payments was based on life expectancy, a nonstigmatizing factor that demonstrably differentiates females from males and that is not measurable on an individual basis. I might have thought, too, that there is nothing arbitrary, irrational, or "discriminatory" about recognizing the objective and accepted (see *ante,* at 704, 707, and 722) disparity in female-male life expectancies in computing rates for retirement plans. Moreover, it is unrealistic to attempt to force, as the Court does, an individualized analysis upon what is basically an insurance context. Unlike the possibility, for example, of properly testing job applicants for qualifications before employment, there is simply no way to determine in advance when a particular employee will die.

The Court's rationale, of course, is that Congress, by Title VII of the Civil Rights Act of 1964, as amended, intended to

eliminate, with certain exceptions, "race, color, religion, sex, or national origin," 42 U. S. C. § 2000e–2 (a)(1), as factors upon which employers may act. A program such as the one challenged here does exacerbate gender consciousness. But the program under consideration in *General Electric* did exactly the same thing and yet was upheld against challenge.

The Court's distinction between the present case and *General Electric*—that the permitted classes there were "pregnant women and nonpregnant persons," both female and male, *ante,* at 715—seems to me to be just too easy.* It is probably the only distinction that can be drawn. For me, it does not serve to distinguish the case on any principled basis. I therefore must conclude that today's decision cuts back on *General Electric,* and inferentially on *Geduldig,* the reasoning of which was adopted there, 429 U. S., at 133–136, and, indeed, makes the recognition of those cases as continuing precedent somewhat questionable. I do not say that this is necessarily bad. If that is what Congress has chosen to do by Title VII—as the Court today with such assurance asserts—so be it. I feel, however, that we should meet the posture of the earlier cases head on and not by thin rationalization that seeks to distinguish but fails in its quest.

I therefore join only Part IV of the Court's opinion, and concur in its judgment.

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE REHNQUIST joins, concurring in part and dissenting in part.

I join Part IV of the Court's opinion; as to Parts I, II, and III, I dissent.

Gender-based actuarial tables have been in use since at least

---

*It is of interest that MR. JUSTICE STEVENS, in his dissent in *General Electric,* strongly protested the very distinction he now must make for the Court.

"It is not accurate to describe the program as dividing ' "potential recipients into two groups—pregnant women and nonpregnant persons." ' . . . The classification is between persons who face a risk of pregnancy and those who do not." 429 U. S., at 161–162, n. 5.

1843,[1] and their statistical validity has been repeatedly verified.[2] The vast life insurance, annuity, and pension plan industry is based on these tables. As the Court recognizes, *ante,* at 707, it is a fact that "women, as a class, do live longer than men." It is equally true that employers cannot know in advance when individual members of the classes will die. *Ante,* at 708. Yet, if they are to operate economically workable group pension programs, it is only rational to permit them to rely on statistically sound and proved disparities in longevity between men and women. Indeed, it seems to me irrational to assume Congress intended to outlaw use of the fact that, for whatever reasons or combination of reasons, women as a class outlive men.

The Court's conclusion that the language of the civil rights statute is clear, admitting of no advertence to the legislative history, such as there was, is not soundly based. An effect upon pension plans so revolutionary and discriminatory—this time favorable to women at the expense of men—should not be read into the statute without either a clear statement of that intent in the statute, or some reliable indication in the legislative history that this was Congress' purpose. The Court's casual dismissal of Senator Humphrey's apparent assumption that the "Act would have little, if any, impact on existing pension plans," *ante,* at 714, is to dismiss a significant manifestation of what impact on industrial benefit plans was contemplated. It is reasonably clear there was no intention to abrogate an employer's right, in this narrow and limited context, to treat women differently from men in the face of historical reliance on mortality experience statistics. Cf. *ante,* at 713 n. 25.

The reality of differences in human mortality is what mortality experience tables reflect. The difference is the added

---

[1] See H. Moir, Sources and Characteristics of the Principal Mortality Tables 10, 14 (1919).

[2] See, *e. g.,* United Nations, 1970 Demographic Yearbook 710–729 (1971).

longevity of women. All the reasons why women statistically outlive men are not clear. But categorizing people on the basis of sex, the one acknowledged immutable difference between men and women, is to take into account all of the unknown reasons, whether biologically or culturally based, or both, which give women a significantly greater life expectancy than men. It is therefore true as the Court says, "that any individual's life expectancy is based on a number of factors, of which sex is only one." *Ante,* at 712. But it is not true that by seizing upon the only constant, "measurable" factor, no others were taken into account. All other factors, whether known but variable—or unknown—are the elements which automatically account for the actuarial disparity. And all are accounted for when the constant factor is used as a basis for determining the costs and benefits of a group pension plan.

Here, of course, petitioners are discriminating in take-home pay between men and women. Cf. *General Electric Co.* v. *Gilbert,* 429 U. S. 125 (1976); *Nashville Gas Co.* v. *Satty,* 434 U. S. 136 (1977). The practice of petitioners, however, falls squarely under the exemption provided by the Equal Pay Act of 1963, 29 U. S. C. § 206 (d), incorporated into Title VII by the so-called Bennett Amendment, 78 Stat. 257, now 42 U. S. C. § 2000e–2 (h). That exemption tells us that an employer may not discriminate between employees on the basis of sex by paying one sex lesser compensation than the other "except where such payment is made pursuant to . . . a differential based on any other factor other than sex . . . ." The "other factor other than sex" is longevity; sex is the umbrella-constant under which all of the elements leading to differences in longevity are grouped and assimilated, and the only objective feature upon which an employer—or anyone else, including insurance companies—may reliably base a cost differential for the "risk" being insured.

This is in no sense a failure to treat women as "individuals" in violation of the statute, as the Court holds. It is to treat

them as individually as it is possible to do in the face of the unknowable length of each individual life. Individually, every woman has the same statistical possibility of outliving men. This is the essence of basing decisions on reliable statistics when individual determinations are infeasible or, as here, impossible.

Of course, women cannot be disqualified from, for example, heavy labor just because the generality of women are thought not as strong as men—a proposition which perhaps may sometime be statistically demonstrable, but will remain individually refutable. When, however, it is impossible to tailor a program such as a pension plan to the individual, nothing should prevent application of reliable statistical facts to the individual, for whom the facts cannot be disproved until long after planning, funding, and operating the program have been undertaken.

I find it anomalous, if not contradictory, that the Court's opinion tells us, in effect, *ante,* at 717–718, and n. 33, that the holding is not really a barrier to responding to the complaints of men employees, as a group. The Court states that employers may give their employees precisely the same dollar amount and require them to secure their own annuities directly from an insurer, who, of course, is under no compulsion to ignore 135 years of accumulated, recorded longevity experience.[3]

MR. JUSTICE MARSHALL, concurring in part and dissenting in part.

I agree that Title VII of the Civil Rights Act of 1964, as amended, forbids petitioners' practice of requiring female employees to make larger contributions to a pension fund than

---

[3] This case, of course, has nothing to do with discrimination because of race, color, religion, or national origin, cf. *ante,* at 709, and nn. 15 and 16. The qualification the Bennett Amendment permitted by its incorporation of the Equal Pay Act pertained only to claims of discrimination because of sex.

do male employees. I therefore join all of the Court's opinion except Part IV.

I also agree with the Court's statement in Part IV that, once a Title VII violation is found, *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405 (1975), establishes a "presumption in favor of retroactive liability" and that this presumption "can seldom be overcome." *Ante*, at 719. But I do not agree that the presumption should be deemed overcome in this case, especially since the relief was granted by the District Court in the exercise of its discretion and was upheld by the Court of Appeals. I would affirm the decision below and therefore cannot join Part IV of the Court's opinion or the Court's judgment.

In *Albemarle Paper Co.* v. *Moody, supra,* this Court made clear that, subject to the presumption in favor of retroactive relief, the District Court retains its "traditional" equitable discretion "to locate 'a just result,'" with appellate review limited to determining "whether the District Court was 'clearly erroneous' in its factual findings and whether it 'abused' its . . . discretion." 422 U. S., at 424. See also Fed. Rule Civ. Proc. 52 (a) (district court findings "shall not be set aside unless clearly erroneous"); *Zenith Radio Corp.* v. *Hazeltine Research, Inc.,* 395 U. S. 100, 123 (1969). The Court here does not assert that any findings of the District Court were clearly erroneous, nor does it conclude that there was any abuse of discretion. Instead, it states merely that the District Court gave "insufficient attention" to certain factors in striking the equitable balance. *Ante,* at 719.

The first such factor mentioned by the Court relates to the "complexity" of the issue presented here, which may have led some pension fund administrators to assume that "a program like the Department's was entirely lawful," and that the alternative of equal contributions was perhaps unlawful because of a perceived "unfair[ness]" to men. *Ante,* at 720. The District Court found, however, that petitioners "should have been placed on notice" of the illegality of requiring larger

contributions from women on April 5, 1972, when the Equal Employment Opportunity Commission amended its regulations to make this illegality clear.[1] The retroactive relief ordered by the District Court ran from April 5, 1972, through December 31, 1974, after which date petitioners changed to an equal contribution program. See *ante,* at 706. Even if the April 1972 beginning date were too early, as the Court contends, *ante,* at 719 n. 36,[2] during the nearly three-year period involved there surely was some point at which "conscientious and intelligent administrators," *ante,* at 720, should have responded to the EEOC's guidelines. Yet the Court today denies all retroactive relief, without even knowing whether petitioners made any efforts to ascertain their particular plan's legality.

The other major factor relied on by the Court involves "the potential impact . . . on the economy" that might result from

---

[1] The District Court quoted the following from EEOC regulations:

"'It shall not be a defense under Title [VII] to a charge of sex discrimination in benefits that the cost of such benefits is greater with respect to one sex than the other.' 29 CFR § 1604.9 (e)." 387 F. Supp. 980, 981 (CD Cal. 1975).

See also 29 CFR § 1604.9 (b) (1977) (employer may not "discriminate between men and women with regard to fringe benefits") (also adopted Apr. 5, 1972); § 1604.9 (f) (employer's pension plan may not "differentiat[e] in benefits on the basis of sex") (adopted Apr. 5, 1972).

[2] The Court also contends that respondents were not entitled to a refund of the full difference between the contributions that they made and the contributions made by similarly situated men, but rather only to the difference between their contributions "and the contributions they would have made under an actuarially sound and nondiscriminatory plan." *Ante,* at 720 n. 36. This point, like the question of the appropriate date discussed in text, was not raised by petitioners and would in any event argue for some reduction in the retroactive relief awarded, not for a complete denial of such relief. On its merits, moreover, the District Court's decision to place the women employees on an equal footing with their male co-workers surely was not unreasonable; the alternative suggested by the Court would still have left the women with higher pension payments than similarly situated men for the relevant period.

retroactive changes in "the rules" applying to pension and insurance funds. According to the Court, such changes could "jeopardiz[e] [an] insurer's solvency and, ultimately, the insureds' benefits." *Ante,* at 721. As with the first factor, however, little reference is made by the Court to the situation in this case. No claim is made by either petitioners or the Court that the relief granted here would in any way have threatened the plan's solvency, or indeed that risks of this nature were not "foresee[n]" and thus "included in the calculation of liability" and reflected in "the rates or contributions charged," *ibid.*[3] No one has suggested, moreover, that the relatively modest award at issue—involving a small percentage of the amounts withheld from respondents' paychecks for pension purposes over a 33-month period, see 553 F. 2d 581, 592 (CA9 1976)—could in any way be considered "devastating," *ante,* at 722. And if a "devastating" award were made

---

[3] When respondents filed their charge with the EEOC in June 1973, petitioners were put on notice of the possibility of retroactive relief being awarded. At that point they could have—and, for all we know, may have—acted to ensure that the outcome of the litigation did not affect the viability of the plan by, for example, escrowing amounts to cover the contingency of losing to respondents. A prudent pension plan administrator, however certain of his legal position, could not reasonably have ignored such a contingency.

Thus, while the Court is correct that years of litigation may ensue after a charge is filed with the EEOC, this fact is largely irrelevant to the Court's concern about "major unforeseen contingencies," such as an award of retroactive relief adversely affecting the financial integrity of the pension plan. *Ante,* at 721, 722 n. 42. And it is hardly likely that a retroactive award for the period prior to the filing of the EEOC charge would be "devastating" for the plan, since, as the Court recognizes, this period could not in any case be longer than two years. *Ante,* at 722, and n. 42; see 42 U. S. C. § 2000e–5 (g) (1970 ed., Supp. V). In the instant case the period from when the award began to run until the charge was filed with the EEOC was just over one year, from April 1972 to June 1973. Even the liability for this period, moreover, at most would have involved only a small percentage of the contributions made by women employees, as discussed in text, *infra.*

in some future case, this Court would have ample opportunity to strike it down at that time.

The necessarily speculative character of the Court's analysis in Part IV is underscored by its suggestion that the retroactive relief in this case would have led to a reduction in the benefits paid to retirees or an increase in the contributions paid by current employees. *Ante,* at 722–723. It states that taking the award out of the pension fund was "apparently contemplated" by the courts below, *ante,* at 723, but the District Court gave no indication of where it thought the recovery would come from. The Court of Appeals listed a number of ultimate sources of the money here involved, including increased employer contributions to the fund or one lump-sum payment from the Department. 553 F. 2d, at 592. Indeed, the Department itself contemplated that the money for the award would come from city revenues, Pet. for Cert. 30–31, with the Department thereby paying for this Title VII award in the same way that it would have to pay any ordinary backpay award arising from its discriminatory practices. Hence the possibility of "harm" falling on "innocent" retirees or employees, *ante,* at 723, is here largely chimerical.

There are thus several factors mentioned by the Court that might be important in some other case but that appear to provide little cause for concern in the case presently before us. To the extent that the Court believes that these factors were not adequately considered when the award of retroactive relief was made, moreover, surely the proper course would be a remand to the District Court for further findings and a new equitable assessment of the appropriate remedy. When the District Court was found to have abused its discretion by denying backpay in *Albemarle,* this Court did not take it upon itself to formulate an award; it remanded to the District Court for this purpose. 422 U. S., at 424, 436. There is no more reason for the Court here to deny all retroactive relief on its own; once the relevant legal considerations are established, the

task of finding the facts and applying the law to those facts is best left to the District Court, particularly when an equitable search for a " 'just result' " is involved, *id.,* at 424.

In this case, however, I do not believe that a remand is necessary. The District Court considered the question of when petitioners could be charged with knowledge of the state of the law, see *supra,* at 729–730, and petitioners do not challenge the particular date selected or claim that they needed time to adjust their plan. As discussed above, moreover, no claim is made that the Department's or the plan's solvency would have been threatened, and it appears unlikely that either retirees or employees would have paid any part of the award. There is every indication, in short, that the factors which the Court thinks might be important in some hypothetical case are of no concern to the petitioners who would have had to pay the award in this case.

The Court today reaffirms "the force of the *Albemarle* presumption in favor of retroactive relief," *ante,* at 723, yet fails to give effect to the principal reason why the presumption exists. In *Albemarle* we emphasized that a "central" purpose of Title VII is "making persons whole for injuries suffered through past discrimination." 422 U. S., at 421; see *id.,* at 418, 422. Respondents in this case cannot be "made whole" unless they receive a refund of the money that was illegally withheld from their paychecks by petitioners. Their claim to these funds is more compelling than is the claim in many back-pay situations, where the person discriminated against receives payment for a period when he or she was not working. Here, as the Court of Appeals observed, respondents "actually earned the amount in question, but then had it taken from them in violation of Title VII." 553 F. 2d, at 592. In view of the strength of respondents' "restitution"-like claim, *ibid.,* and in view of the statute's "central" make-whole purpose, *Albemarle,* 422 U. S., at 421, I would affirm the judgment of the Court of Appeals.