Mahmood BUTT, Plaintiff,

v.

BOARD OF TRUSTEES OF EASTERN ILLINOIS UNIVERSITY, James K. Johnson, Cynthia Nichols, Robert Bates, Rori Carson, Carol Helwig, and Shelli Jennings, Defendants.

No. 97–2045.

United States District Court,
C.D. Illinois,
Urbana Division.

June 15, 1999.

Glenn A Stanko, Rawles O'Byrne Stanko & Kepley PC, Champaign, for Mahmood Butt, plaintiff.

Lisa M Huson, Eastern IL University, Office of University Counsel, Charleston, Richard P Klaus, Heyl Royster Voelker & Allen, Urbana, Deborah L Barnes, Asst Atty Gen, Springfield, for Board Board of Trustees of Eastern Illinois University, James K Johnson, Cynthia Nichols, Robert Bates, Rori Carson, Carol Helwig, Shelli Jennings, defendants.

### ORDER

BERNTHAL, United States Magistrate Judge.

In April 1997, Plaintiff Mahmood Butt filed a Complaint and Demand for Jury Trial (# 1) alleging (1) a violation of Title VII against Defendant, the Board of Trustees of Eastern Illinois University (hereinafter "Board"), and (2) violations of Sections 1981 and 1983 (42 U.S.C. §§ 1981, 1983) against Defendants James K. Johnson, Cynthia Nichols, Robert Bates, Rori Carson, Carol Helwig, and Shelli Jennings. These claims arose as a result of Defendants' failure to interview and hire Plaintiff for the position of Dean of the College of Education and Professional Studies (hereinafter "CEPS") at Eastern Illinois University (hereinafter "EIU").

In April 1999, Defendants Johnson, Nichols, and the Board filed a Motion for Summary Judgment (# 42) and Defendants Bates, Carson, Helwig, and Jennings filed a Motion for Summary Judgment (# 45). Plaintiff filed a Motion To Strike Materials Submitted in Support of Defendants' Motions for Summary Judgment (# 56). In May 1999, Defendants Johnson, Nichols, and the Board filed a Motion To Strike (# 62).

After reviewing the pleadings, depositions, affidavits, answers and interrogato-

ries, and memoranda presented by the parties, this Court **GRANTS** the Motion for Summary Judgment (# 42) from Defendants Johnson, Nichols, and the Board and **GRANTS** the Motion for Summary Judgment (# 45) from Defendants Bates, Carson, Helwig, and Jennings.

## I. Background

Plaintiff is of brown color, Pakistani, and a native of Pakistan. (Complaint, Count II, ¶ 13). He is chairman of the Department of Secondary Education and Foundations in the College of Education and Professional Studies at EIU. (*Id.,* Counts II and III, ¶ 14). In December 1994, EIU initiated a national search to fill the position of dean of the CEPS, and in January 1995, Plaintiff submitted his application for the position. (*Id.,* Counts II and III, ¶¶ 15–16).

A search and screening committee was formed to review the applicants' qualifications for the position, conduct interviews, and make recommendations about which candidate to hire. (*Id.,* Counts II and III, ¶ 18.) The search committee was charged with presenting a list of acceptable candidates and each candidate's strengths and concerns to Dr. Barbara Hill, EIU's Vice-President of Academic Affairs. Hill had the authority and responsibility to make the final hiring decision.

Defendant Johnson, Dean of EIU's College of Art & Humanities, served as the chair of the committee, and Defendant Nichols, EIU's Director of Affirmative Action and Cultural Diversity, was a committee member. (*Id.,* Counts II and III, ¶¶ 19–20). One of Nichols' duties was to insure that no discrimination occurred during the search process. She distributed a list of prohibited areas of inquiry at the beginning of the search process. The remaining individual Defendants were members of the search committee and members of the subcommittee that checked Plaintiff's references.

The search committee subsequently narrowed the pool of applicants to five semi-finalists, including Plaintiff. (*Id.,* Counts II and III, ¶ 22). To make this first cut, an applicant had to receive a majority of votes of the search committee (hereinafter "the first ballot"). Seventeen committee members voted on each of 11 candidates; five candidates received a majority of votes. The five semi-finalists received votes as follows: Leah Engelhardt received 15 votes; Marc Mahlios received 14 votes; Michael Kotar received 10 votes; Elizabeth Hitch received 10 votes, and Plaintiff received 9 votes.

Subcommittees were then formed to check the semi-finalists' references, evaluate their strengths and weaknesses, and report to the search committee. (*Id.,* Counts II and III, ¶ 23). The subcommittee reporting on Plaintiff comprised Defendants Carson, Jennings, Helwig, and Bates.

Defendant Jennings interviewed Ronald Leathers, acting dean of the CEPS from February to August 1995, and one of Plaintiff's references. During that interview, Leathers told Jennings that he was aware of a perception that Plaintiff did not treat women fairly or did not treat women the same as men; Leathers stated that he did not believe this perception was true. (Leathers dep., pp. 34–36, 42). When Leathers became acting dean of CEPS in February 1995, he informed Plaintiff that some women faculty members perceived that he did not treat them fairly or work well with them. During the interview with Jennings, Leathers attributed the perception that Plaintiff was "patronizing" to his "style" (*Id.,* dep., p. 20) and stated that his style applied equally to men and women; that he and Plaintiff had patronized each other a time or two because they worked together and shared ideas; and that Plaintiff worked well even with those people who had voiced these concerns. (*Id.,* pp. 20, 36–40, 55, 70–71, 78.) Leathers suggested that part of the misunderstanding might be "cultural" in the sense that the "cultural differences that we have and that we enjoy" might explain some of Plaintiff's

"style." (*Id.*, p. 39.) Leathers also talked about Plaintiff's "very formal, very articulate, very specific, and very direct approach," his extreme courteousness and politeness, formal dress, structured meetings, focus, and confidence in his opinions and ideas. (*Id.*, pp. 37–40.)

Each subcommittee report included a brief description of "Strengths" and "Concerns." The subcommittee report on Plaintiff listed the following statement as a concern: "Paternalizing attitude toward women-may be result of cultural background but has lived and worked in U.S. for 30 years." (Ex. EE.) It also listed as concerns the following: (1) limited budget experience, (2) insufficient current professional research/writing in refereed publications, (3) limited NCATE experience, (4) limited results of recent fundraising, (5) limited grant-writing success, and (6) lack of public school teaching experience.

In April 1995, each subcommittee presented its report to the search committee. The committee discussed those reports, including Plaintiff's alleged "paternalizing attitude." Then it voted again (hereinafter "the second ballot") on the semi-finalists. In the second ballot, Defendant Johnson—who had not voted during the first ballot—voted in favor of Plaintiff. Nineteen committee members voted and the semi-finalists received the following votes: Engelhardt received 19 votes; Mahlios received 19 votes; Hitch received 18 votes; Kotar received 16 votes; and Plaintiff received 9 votes. Plaintiff did not receive a majority vote during the second ballot, and the search committee then voted 10 to 8 to designate him a "reserve finalist." As a reserve finalist, he would not be granted an interview for the position unless one of the other four finalists withdrew. (*Id.*, Counts II and III, ¶¶ 24–25). No candidates withdrew; therefore, the committee did not interview Plaintiff. The committee presented its list of acceptable candidates and their strengths and concerns to Dr. Hill and she ultimately selected Elizabeth Hitch for the position.

In September 1995, Plaintiff filed a charge of unlawful discrimination with both the Illinois Department of Human Rights and the United States Equal Opportunity Employment Commission (hereinafter EEOC) regarding the committee's hiring decision. (*Id.*, Count I, ¶¶ 24–25). In February 1997, the EEOC issued Plaintiff a "right to sue" letter, and in March 1997, Plaintiff filed a Complaint and Demand for Jury Trial (# 1) with this Court.

## A. Title VII Claim Against EIU (Count I)

In his Title VII (Count I) claim against the Board, Plaintiff alleges that he was denied an interview because the subcommittee wrongfully and intentionally attributed to him a patronizing and discriminatory attitude toward women, based on a stereotypical view of his color, Pakistani ethnicity, Pakistani national origin, race, and Muslim religion, rather than on any information provided by Plaintiff's listed references or other first-hand information. (*Id.*, Count I, ¶¶ 21(a)-(b), (e)-(f)). Plaintiff further asserts that he was the only one of the five semi-finalists whom the search committee did not personally interview, and that he was as qualified for the position as the other four candidates, two male and two female, non-Pakistani, white, native citizens of the United States. (*Id.*, Count I, ¶¶ 21(h)-(i)). Plaintiff alleges that Defendants' actions violated Section 703(1)(1) of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e–2(a)(1)). (*Id.*, Count I, ¶ 21).

## B. Section 1983 (Equal Protection) Claim Against Defendants Johnson, Nichols Bates, Carson, Helwig, and Jennings (Count II)

In Count II of his complaint, Plaintiff realleges the factual predicate of his Title VII claims and asserts a right of recovery from Defendants Johnson, Nichols, Bates, Carson, Helwig, and Jennings, pursuant to Section 1983 (42 U.S.C. § 1983). In his Section 1983 claim, Plaintiff alleges that he was denied a personal interview because

the subcommittee wrongfully and intentionally attributed to him a patronizing and discriminatory attitude toward women, based on his color, Pakistani ethnicity, and national origin, rather than on any information provided by Plaintiff's listed references or other first-hand information. (*Id.*, Count II, ¶¶ 26(a)-(b), (e)). This characteristic represents a stereotypical view of Pakistani males, males of brown color, and/or males of Pakistani origin. (*Id.*, Count II, ¶¶ 26(f)). Plaintiff further asserts that he was the only one of the five semi-finalists whom the search committee did not personally interview, and that he was as qualified for the position as the other four candidates. (*Id.*, Count II, ¶¶ 26(g)-(i)). Plaintiff alleges that Defendants' actions violated his right to equal protection of the laws under the Fourteenth Amendment of the United States Constitution. (*Id.*, Count II, ¶ 26).

### C. Section 1981 Claim Against Defendants Johnson, Nichols Bates, Carson, Helwig, and Jennings (Count III)

Plaintiff's allegations as to Count III, the Section 1981 claim against Defendants Johnson, Nichols, Bates, Carson, Helwig, and Jennings, are essentially the same as the Title VII and Section 1983 claims. In addition, he alleges that, solely because of his color and Pakistani origin, Defendants intentionally discriminated against him by denying him equal rights in the making and enforcement of a contract, in violation of Section 1981 (42 U.S.C. § 1981). (*Id.*, Count III, ¶ 26).

### D. Additional Procedural Background

In April 1999, Defendants Johnson, Nichols, and the Board filed a Motion for Summary Judgment (# 42) and Defendants Bates, Carson, Helwig, and Jennings filed a Motion for Summary Judgment (# 45). Plaintiff filed a Motion To Strike Materials Submitted in Support of Defendants' Motions for Summary Judgment (# 56). In May 1999, Defendants Johnson, Nichols, and the Board filed a Motion To Strike (# 62).

## II. Discussion

### A. Summary Judgment Standard

Rule 56(c) requires a district court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Id.* at 2552–53. The party opposing the motion must then make a showing sufficient to demonstrate the existence of a material issue for trial. *Id.*

The Court applies this standard with particular care in employment discrimination cases, where intent and credibility are critical. *Senner v. Northcentral Technical College,* 113 F.3d 750, 757 (7th Cir.1997). The Court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Nevertheless, it is not required to draw every conceivable inference from the record—only those inferences that are reasonable. *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). Moreover, a party needs more than a scintilla of evidence to defeat summary judgment. *Senner,* 113 F.3d at 757. Neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment. *Hoffman v. MCA, Inc.,* 144 F.3d 1117, 1121 (7th Cir. 1998). "An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

## B. Analytical Framework

With regard to Count I, the Board argues that the Court should grant summary judgment because Plaintiff failed to (1) establish a *prima facie* case, or (2) present evidence of intentional discrimination or pretext. Specifically, it alleges that (1) Plaintiff has failed to establish a *prima facie* case of employment discrimination because (a) the committee's failure to grant Plaintiff a personal interview does not constitute an "adverse action," and (b) Plaintiff was not as well-qualified as the other candidates; and (2) alternatively, the committee had a legitimate nondiscriminatory reason for its action.

Similarly, Defendants argue that the Court should grant summary judgment on the Section 1983 claim because Plaintiff failed to present evidence of intentional discrimination based on protected class membership. Defendants also argue that the Court should grant summary judgment on the Section 1981 claim because Plaintiff failed to rebut Defendants' legitimate, nondiscriminatory explanation for its behavior.

The analytical framework for a Title VII claim is the same as for Sections 1981 and 1983 claims (42 U.S.C. §§ 1981, 1983). *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2746–47 n. 1, 125 L.Ed.2d 407 (1993) (citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989)); *Eiland v. Trinity Hospital,* 150 F.3d 747, 750 (7th Cir.1998). Bearing that in mind, the Court first considers Plaintiff's Title VII discrimination claim.

■ Under Title VII, it is unlawful for an employer to discriminate against an employee because of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1). When, as here, the alleged discrimination is based on a claim of disparate treatment, proof of intentional discrimination is required. *Gonzalez v. Ingersoll Milling Machine Co.,* 133 F.3d 1025, 1031 (7th Cir.1998). An employee may demonstrate intentional discrimina-

tion by providing either direct or indirect evidence. Direct evidence of discrimination is evidence that one can interpret as an acknowledgment of the employer's discriminatory intent without relying on any inference. *Mojica v. Gannett Co.,* 7 F.3d 552, 561 (7th Cir.1993); *Rothman v. Emory University,* 123 F.3d 446, 451 (7th Cir. 1997). To constitute direct evidence of discrimination a statement must relate to the motivation of the decisionmaker responsible for the contested decision. *Id.*

■ Plaintiff contends that the statement in the subcommittee's report about his cultural background constitutes direct evidence of discriminatory intent. The Court disagrees. That statement neither acknowledges a discriminatory intent nor relates to the committee's motivation for its decision not to interview Plaintiff.

■ Direct evidence of intentional discrimination is rare. *Mills v. First Federal Savings & Loan Ass'n,* 83 F.3d 833, 841 (7th Cir.1996). When it is not available, a plaintiff can prove his discrimination claim with indirect or circumstantial evidence by employing the burden-shifting method originally established in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this method, a plaintiff must first demonstrate a *prima facie* claim of disparate treatment by showing that he suffered an adverse employment action and that similarly situated employees were treated more favorably. Specifically, Plaintiff must show that: (1) he was a member of a protected class, (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) others who were similarly situated except for not having the protected characteristics were treated more favorably than he was. *Taylor v. Canteen Corp.,* 69 F.3d 773, 779 (7th Cir. 1995).

If an employee can establish all the elements of a *prima facie* case, a rebuttable presumption will arise that the employer unlawfully discriminated against him.

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The burden of production then shifts to the defendant to produce evidence that the alleged adverse action occurred for a legitimate, nondiscriminatory reason. *McDonnell Douglas,* 93 S.Ct. at 1824–25; *Dunning v. Simmons Airlines, Inc.,* 62 F.3d 863, 869 (7th Cir.1995). If the defendant meets this burden of production, the presumption of discrimination dissolves, and the burden shifts back to the plaintiff to show that the proffered reason was merely a pretext for discrimination. *Burdine,* 101 S.Ct. at 1094. The plaintiff bears the ultimate burden of proving that the protected factors were the determining factor in the defendant's action. *Saint Mary's,* 113 S.Ct. at 2747–49. However, to defeat summary judgment, the plaintiff need only produce evidence from which a rational factfinder could infer that the defendant lied about its proffered reasons for the purported adverse action. *Anderson v. Baxter Healthcare,* 13 F.3d 1120, 1124 (1994).

■ The above analysis applies to discrimination claims brought under Sections 1981 and 1983 as well as Title VII claims. *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989). Each type of claim requires proof of intentional discrimination; thus, a plaintiff who fails to prove discriminatory motive in a Title VII disparate treatment claim necessarily fails to meet the purposeful discrimination requirement for Sections 1981 and 1983 violations. *See Personnel Administrator v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). With these standards in mind, the Court now examines the question of whether Plaintiff has produced sufficient evidence to defeat Defendants' motions for summary judgment.

## C. Analysis

■ Plaintiff first contends that he has established a *prima facie* case of discrimi-

natory failure to interview. For several reasons, Defendants contend that he has not. However, when a defendant offers an explanation for an adverse employment action that the Court determines to be nonpretextual, the Court may avoid deciding whether the plaintiff has established his *prima facie* case and instead dispose of the claim based on the issue of pretext. *Abioye v. Sundstrand Corp.,* 164 F.3d 364, 368–69 (7th Cir.1998); *see EEOC v. Our Lady of the Resurrection Medical Center,* 77 F.3d 145, 149–50 (7th Cir.1996) (advancing to dispositive issue of pretext without deciding if the plaintiff established prima facie case). Therefore, the Court considers first the issue of pretext, declining to determine at this time whether Plaintiff has established a *prima facie* case.

In this case, Defendants state that they decided not to interview Plaintiff because he was not as qualified as the other candidates. On its face, this reason is legitimate and nondiscriminatory; thus, it dissolves the presumption of discrimination. Plaintiff contends that the issue of qualifications is merely a pretext for Defendants' discriminatory purposes. He relies primarily on two factors: his qualifications and the use of the phrase "cultural background" in the subcommittee's report.

■ Pretext means more than a mistake on the part of the employer; it means "a lie, specifically a phony reason for some action." *Russell v. Acme–Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995). In other words, the plaintiff bears the burden of showing that the employer's reason for the adverse employment action was a lie or had no basis in fact. *Crim v. Board of Education of Cairo School District No. 1,* 147 F.3d 535, 541 (7th Cir.1998). A plaintiff may establish pretext directly by showing that "a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason [for not being given an interview] is unworthy of credence." *Sarsha v. Sears Roebuck and Co.,* 3 F.3d 1035, 1039 (7th

Cir.1993); *Adusumilli v. City of Chicago*, 164 F.3d 353, 363–64 (7th Cir.1998). He may establish pretext indirectly by proving one of the following: (1) Defendants' explanation had no basis in fact; (2) the proffered explanation was not the "real" reason; or (3) the reason stated was insufficient to warrant the adverse employment action. *Bahl v. Royal Indemnity Company*, 115 F.3d 1283, 1291 (7th Cir.1997); *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir.1996).

■ Plaintiff contends first that his qualifications are as good as the other candidates and he states that his designation as reserve finalist demonstrates this. However, a plaintiff's subjective belief in the merit of his own qualifications does not raise a material dispute about the defendant's honest belief in its asserted reason for a decision. *Johnson v. University of Wisconsin–Eau Claire*, 70 F.3d 469, 481 (7th Cir.1995); *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir.1996) ("plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reason for the employment actions"). Moreover, the committee's vote on the first ballot indicated that the committee considered him the least strong of the five semifinalists. Plaintiff received only 9 of 17 votes, compared with 15, 14, 10, and 10 votes for the other candidates. The fact that the search committee voted 10 to 8 in favor of designating Plaintiff a "reserve finalist" does not indicate that his qualifications were as good as the other candidates' qualifications.

■ Plaintiff next contends that the committee erred in assessing his qualifications. He asserts that he had in fact published several articles that were not listed on the resume he included with his application and that his publication record was comparable to other candidates; thus, the committee was mistaken in believing that he was not as qualified as the other applicants on that basis. Plaintiff also as-serts that (1) his NCATE experience was sufficient based on his experience coordinating the NCATE/ISBE Accreditation and Program Approval Task Force (# 52, ¶ 20); (2) he had sufficient fundraising experience (# 52, ¶¶ 23–25); and (3) his lack of public school teaching experience was irrelevant because the position announcement did not require such experience (# 52, ¶¶ 26–27).

It may well be that the committee underestimated Plaintiff's qualifications. Nevertheless, Title VII does not protect an employee from an employer's error; it protects him from adverse employment decisions based on protected characteristics. The Seventh Circuit has noted that employers may act for many reasons, good and bad, and they may err in evaluating an employee's qualifications, but unless they act for forbidden reasons, these differences in assessment do not matter. *Kuhn v. Ball State University*, 78 F.3d 330, 332 (7th Cir.1996). Consequently, unless Defendants acted for a forbidden reason, Title VII does not interfere. An employer's mistake in evaluating the employee's qualifications is not evidence that the employer proffered a pretextual reason in a Title VII action for failing to promote the employee when it cited the employee's lack of qualifications. *Mills v. Health Care Service Corp.*, 171 F.3d 450, 458 (7th Cir. 1999).

Moreover, whether Plaintiff is as qualified as the other applicants is not the Court's decision; the Court does not sit as a super-personnel department reviewing the business decisions of employers. *Debs v. Northeastern Illinois University*, 153 F.3d 390, 396 (7th Cir.1998). Evaluation of credentials is a subjective and discretionary task. Members of the search committee may properly assign different significance to criteria such as the importance of publishing, the significance of articles published versus books, public school teaching, or scholarly presentations. *See Senner*, 113 F.3d at 757 (employers may have subjective preferences as long as

they do not express forbidden preferences). The Court may not review the propriety of Defendants' decision not to interview Plaintiff for the position; it considers only whether Plaintiff has proven that the reasons for that decision were pretextual because the search committee (or more properly, those committee members making the decision) did not honestly believe them. *See Crim,* 147 F.3d at 541. The only exception to this would be where the employer's evaluation was so egregiously mistaken that it had no basis in fact. *Id.* Here, a look at the other candidates' résumés establishes that the committee had a factual basis for its decision, notwithstanding the opinions of Leathers, Kenneth Sutton (a committee member), or Plaintiff himself.

Plaintiff also alleges that "real reason" he was not granted a personal interview was because of interdepartmental politics. He contends that members of the subcommittee disfavored his candidacy from the beginning, based on the following: (1) Defendant Helwig and Kathleen Shank had both expressed concerns about Plaintiff's attitude toward women; (2) Shank was department chair in the department where Defendant Carson worked and Defendant Jennings was a graduate student, so Carson and Jennings would mirror Shank's opinion of Plaintiff; (3) Defendant Carson and Shank were on Jennings' thesis committee; (4) Helwig was involved in a long-term dating relationship with a man who had lost out to Plaintiff as department chair, so she would be biased against him; (5) Helwig worked with Shank and Carson; and (6) Sandy Schroeder (a committee member) overheard a conversation between Jennings and Carson that led her to believe that they did not consider him a viable candidate. However, Plaintiff offers *no* evidence that the ulterior political motives were based on protected characteristics. Schroeder stated that neither Jennings nor Carson mentioned Plaintiff's race, religion, national origin, or cultural background during the course of

their conversation. Assuming that Plaintiff's "conspiracy" theory is true, it indicates that the subcommittee members were motivated by personal and political motives but it does not show or even tend to show that Plaintiff was denied an interview because of his religion, national origin, or race. Even when a defendant's reason for an employment decision is unethical or politically motivated, it is not protected by Title VII unless based on a protected characteristic. *See Visser v. Packer,* 924 F.2d 655, 657–58 (7th Cir. 1991). Thus, Plaintiff's conspiracy theory actually undercuts his contention that Defendants intentionally discriminated against him in violation of Title VII.

Finally, Plaintiff contends that the subcommittee's inclusion in its report of the phrase "[p]aternalizing attitude toward women—may be result of cultural background but has lived and worked in U.S. for 30 years" constitutes an impermissible stereotype and evidence of Defendants' ethnically-based discriminatory motive in not interviewing him. The only time anyone referred to Plaintiff's religion occurred when Ken Sutton, one of Plaintiff's supporters, brought it up, and his comment was not derogatory in any way. A reference to Plaintiff's skin color occurred when one committee member stated that Plaintiff's skin was no browner than that of his counsel or other Caucasians. The real culprit here is the phrase "cultural background." Plaintiff's claims rest almost entirely on what he infers from the use of this phrase; on its foundation, he has built a complex story of intentional discrimination prevading the subcommittee and then infecting and influencing the search committee's decision not to interview him.

The Court finds that the subcommittee's inclusion of this phrase in its report does not create a genuine issue of material fact as to whether it intentionally discriminated against Plaintiff based on prohibited factors. Furthermore, even assuming the phrase at issue demonstrated the *subcommittee*'s intentional discrimination, Plain-

tiff did not present evidence that raised a factual question regarding whether the committee's decision not to interview was motivated by intentional discrimination.

Plaintiff relies on deposition testimony to support his contention. Defendant Carson stated that the reference to "cultural" referred to where Plaintiff came from. (Carson dep., p. 126.) Defendant Bates testified that the phrase "may be result of cultural background but has lived and worked in U.S. for 30 years" meant that Plaintiff should have become sensitized to the relationships between men and women during that period of time. (Bates dep., p. 65.) Defendant Helwig stated that the characterization of Plaintiff's attitude was something that was not to be asked or discussed. (Helwig dep., p. 69.) In May 1995, Ken Sutton wrote in a letter to Defendant Nichols that he believed that the subcommittee had fabricated some of their concerns about Plaintiff and that its report "implies that being from Pakistan has something to do with men being patronizing toward females." He also stated as follows: "[I testified] to the Search Committee that this charge of being 'patronizing' toward women was especially damaging in his case because he is a Moslem. Unfortunate stereotypes could come into play. In fact, they were *used.*" (Emphasis in original.) Relying on this information, Plaintiff contends that the subcommittee's use of the phrase in question proves that it discriminated against Plaintiff by using a common stereotype—patronizing attitude toward women—based on a protected characteristic—national origin. That characterization then became the focus of search committee discussions and resulted in the committee's refusal to interview Plaintiff.

■ Title VII protects employees from employment decisions that are predicated on stereotyped impressions involving protected characteristics. *City of Los Angeles Department of Water v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 1375, 55 L.Ed.2d 657 (1978). However, it appears that Plaintiff misunderstands what a stereotype is. To say that a particular person has a patronizing attitude toward women is not a stereotype. However, to say that all Pakistani men patronize women is an impermissible stereotype. *See Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). For example, in an age discrimination case, an employer cannot rely on age as a proxy for an employee's remaining characteristics but must focus on those factors directly. *Id.* at 1706–1707; *Goshtasby v. Board of Trustees of the University of Illinois,* 141 F.3d 761, 772 (7th Cir.1998).

Similarly, in Title VII cases involving stereotypes, the employer cannot rely on national origin or race or religion as a proxy for an employee's personal characteristics, such as how the employee interacts with women. An employer would violate Title VII if it subjected a man of Pakistani origin to an adverse employment decision based on the employer's belief that Pakistani males have a patronizing attitude toward women. However, Title VII does not prohibit an employer from considering whether an employee has a particular characteristic. *Western Air Lines, Inc. v. Criswell,* 472 U.S. 400, 105 S.Ct. 2743, 2756, 86 L.Ed.2d 321 (1985) (the ADEA commands that "employers are to evaluate [older] employees ... on their merits and not their age"); *Blackwell v. Cole Taylor Bank,* 152 F.3d 666, 672 (7th Cir.1998) (antidiscrimination laws seek to encourage employers to evaluate individual workers on specific characteristics and not to indulge in stereotypes).

The job description for the deanship stated as follows: "Ability and readiness to be a strong advocate promoting the needs of diverse undergraduate and graduate programs within the college are required. Demonstrated leadership in affirmative action and cultural diversity." Mr. Leathers stated in his deposition that he told Jennings that some faculty members perceived that Plaintiff had a patronizing attitude toward women and that it may be

the result of "cultural differences." In addition to the purported "patronizing" attitude, Leathers ascribed to cultural differences Plaintiff's "very formal, very articulate, very specific, and very direct approach," and extreme courteousness and politeness, formal dress, structured meetings, focus, and confidence in his opinions and ideas. (Leathers dep., pp. 37–40.)

Nevertheless, Plaintiff makes much of the fact that the issue of how he interacts with women—his purported "paternalizing attitude"—was a topic of discussion at two meetings, the March 1995 subcommittee meeting and the April 1995 search committee meeting. He stated that "a debate ensued relating to the stereotypical characterization made regarding Plaintiff." (Plaintiff's Statement of Additional Facts, ¶ 106.) The evidence shows that the discussions of the committee and subcommittee did not revolve around generalities involving Plaintiff's race, color, national origin, or religion. Instead, after hearing that Leathers reported that some faculty members thought that Plaintiff acted patronizing toward women, the subcommittee discussed its obligation to report that information to the search committee and how to do it properly. Most of the search committee's discussion to which Plaintiff objects involved whether the committee was using stereotypes or proceeding in a legally correct way and consistent with EIU's procedures. Accordingly, the committee did not discriminate against Plaintiff when it discussed the issue of how he interacts with women—his purported "paternalizing attitude."

■ Furthermore, mere reference to a protected characteristic does not inevitably indicate that an employer was motivated by that characteristic in making employment decisions. *Courtney v. Biosound*, 42 F.3d 414, 419 (7th Cir.1994). No inference of guilt can be drawn from an employer's sensitivity to its potential liability under Title VII when hiring an employee, unless the innocuous evidence of awareness of protected traits is made significant by other evidence that would give rise to such an inference. *Id.* at 419 (refusing to infer that an employer's awareness of an employee's age infers discriminatory motive without other evidence); *Rothman*, 123 F.3d at 447. The record here reflects an educational institution attempting to be cautious in the hiring process to avoid violating federal law. It does not provide any basis for a finding of intentional discrimination based on religion, national origin, race, or color.

Finally, in a disparate treatment case such as this, liability depends on whether a protected trait *actually* played a role in that process and had a determinative influence on the outcome. *See, e.g., United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Burdine*, 101 S.Ct. at 1093–1095. Referring to a protected characteristic does not necessarily indicate that an employer is motivated by that characteristic in making employment decisions. *See Courtney*, 42 F.3d at 419.

■ Furthermore, opinions of committee members regarding the motivation of other committee members do not constitute evidence of intentional motivation. In her affidavit, Judith Lyles, one of the committee members, opined that the statement at issue represented a stereotype of males who have the same race, color, national origin, and religion as Plaintiff. She also stated that she believed that discriminatory factors such as Plaintiff's race, color, national origin, and religion motivated the committee's decision not to interview. Similarly, Ken Sutton opined that stereotypes were used. Any fact relied upon to resist summary judgment must be admissible in evidence. *Principal Mutual Life Insurance Co. v. Charter Barclay Hospital, Inc.*, 81 F.3d 53, 57 (7th Cir.1996). Because this testimony is not based on personal observation, Plaintiff cannot rely on it to show that a genuine issue exists for trial. *Hong v. Children's Memorial Hospital*, 993 F.2d 1257, 1265 (7th Cir.

1993); *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994); *Gorgis v. Village of Niles,* No. 95C3797, 1997 WL 89129, \*3 (N.D.Ill.1997). Without more, these opinions regarding others' motivations do not provide evidence of intentional discrimination.

When a purported adverse employment decision is made by a group such as the search committee, the Court must consider the question of causation. Assuming *arguendo* that the four subcommittee members had an improper motive, did that result in the alleged adverse action? The Seventh Circuit has concluded that a nexus must exist between an allegedly discriminatory remark and an adverse employment decision under the indirect method of proof before the remark can give rise to an inference of discriminatory intent. A nexus is required because "evidence of the remarks, without more, does not give rise to an inference of discrimination." *Knox v. The First National Bank of Chicago,* 909 F.Supp. 569, 574 (N.D.Ill.1995); *see Hill v. Burrell Communications Group, Inc.,* 67 F.3d 665, 669 (7th Cir.1995) (without a nexus, a reasonable factfinder could not conclude that the decisionmaker's reference to race revealed discriminatory intent); *see Hong,* 993 F.2d at 1266.

Assuming *arguendo* that the entire subcommittee had improper motives, Plaintiff must show that it was able to influence the search committee's decision—or at least present a genuine question of fact regarding that issue. Generally, courts have agreed that a "significant bloc" of committee members must have been influenced by a discriminatory motive before liability will arise under Title VII for the purportedly adverse employment decision. *See Union Pacific Railroad Company v. Village of South Barrington,* No. 96C1698, 1998 WL 292394 (N.D.Ill., 1998) (granting summary judgment when a plaintiff could not prove that a significant bloc of legislators were improperly motivated in a Section 1983 suit); *Scott–Harris v. City of Fall River,* 134 F.3d 427 (1st Cir.1997), *rev'd on other grounds sub nom, Bogan v. Scott–Harris,* 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998).

Here, no such influence can be inferred. First, the four Defendants on the subcommittee do not by themselves constitute a significant bloc of the 19 members of the search committee. *See Union Pacific,* 1998 WL 292394, at \*1. Second, the vote itself shows that the subcommittee's alleged intentional discrimination had no discernible influence on the committee's decision. In the first ballot, Plaintiff received nine votes—the fewest number of the five semi-finalists. The second ballot occurred *after* the subcommittee presented its report and Plaintiff again received the fewest votes of the five candidates. Assuming that the phrase at issue influenced a change, only *one* of the nine committee members who voted for him during the first ballot changed his or her vote as a result. Defendant Johnson had not voted in the first ballot; in the second ballot, he voted in favor of Plaintiff. Of the two committee members who did not vote during the first ballot, one voted for him and one voted against him. These numbers do not give rise to a genuine issue of fact regarding whether the subcommittee improperly influenced the search committee's decision not to interview Plaintiff.

Given Plaintiff's own suggestion that personal politics motivated the actions of the subcommittee members, the court finds unpersuasive Plaintiff's attack on the honesty of Defendants' reasons for failing to interview him. Assumptions are not facts. This case can survive summary judgment only to the extent it is based on properly admissible evidence. Plaintiff has failed to present evidence of a genuine issue of material fact regarding whether the committee's proffered reason for failing to interview him was pretextual, whether the real reason was intentional discrimination based on national origin, race, religion, or color, or whether Defendants intentionally discriminated against Plaintiff. Accordingly, the Court grants

Defendants' motions for summary judgment.

Plaintiff also contends that a number of disputed fact issues preclude summary judgment in this case. The Court recognizes that many matters are disputed; however, after reviewing both parties' statements of undisputed facts and objections thereto, the Court concludes that those matters are not outcome determinative. A factual dispute does not preclude summary judgment unless the disputed fact determines outcome under the governing law. *See Hoffman v. MCA, Inc.*, 144 F.3d at 1121.

## D. Section 1983 (Equal Protection) Claim Against Defendants Johnson, Nichols Bates, Carson, Helwig, and Jennings (Count II)

In Count II of his complaint, Plaintiff alleges that Defendants' refusal to grant him a personal interview denied him equal protection of the law. To establish a *prima facie* case of discrimination under the Equal Protection Clause, a plaintiff is required to demonstrate, *inter alia*, that he "is otherwise similarly situated to members of the unprotected class" and that he "was treated differently from members of the unprotected class." *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir.1993). Plaintiff also must demonstrate that Defendants acted with discriminatory intent. *Id.* As the Court explained in the previous section, Plaintiff has failed to provide evidence supporting his claim of purposeful discrimination. Accordingly, summary judgment is proper with respect to Count II.

## E. Section 1981 Claim Against Defendants Johnson, Nichols, Bates, Carson, Helwig, and Jennings (Count III)

Section 1981 prohibits a person acting under color of state law from denying another person equal rights in the making and enforcement of a contract on the basis of race or ethnicity. 42 U.S.C. § 1981. Section 1981 differs from Title VII in the types of discrimination it proscribes, but the methods of proof and elements are essentially identical for both. *Eiland*, 150 F.3d at 750. Among other things, both require a showing of intentional discrimination and Plaintiff may use either direct or indirect evidence to support his claim.

In Count III, Plaintiff apparently contends that Defendants Johnson and Nichols intentionally discriminated against him because they failed to adequately monitor the committee meeting or prevent the committee from considering prohibited characteristics and failed to stop the proceedings once they were "tainted" by discussion of protected characteristics. With regard to the subcommittee members, Plaintiff contends that they reported that "although plaintiff had lived and worked in the United States for almost 30 years, he had a patronizing attitude towards [sic] women" and this report was not based on information from Plaintiff's references or on the first-hand account of any person in violation of established procedures.

Here, the phrase in the subcommittee report clearly has no probative value with regard to Defendants Johnson and Nichols because neither of them helped produce that report. Indirect evidence that Nichols and Johnson intentionally discriminated against Plaintiff is equally lacking. First, Nichols was EIU's Director of Affirmative Action and Cultural Diversity; she participated in the search committee meetings, but did not vote. Second, Johnson did not vote in the first ballot and he voted in favor of Plaintiff in the second ballot.

Plaintiff contends that a genuine issue of material facts exists regarding whether Nichols or Johnson failed to stop discussion of the protected characteristics or limit the discussion at to the written materials in the resume, subcommittee reports, and references. Such a dispute is not material evidence regarding these Defendants' alleged intentional discrimination.

As the Court explained in the previous section, Plaintiff has failed to provide evidence supporting his claim that the sub-

committee members purposefully discriminated against him. Accordingly, summary judgment is proper with respect to Count III.

### III. Summary

For the reasons set forth above, the Court **GRANTS** Defendants Johnson, Nichols, and the Board's Motion for Summary Judgment (# 42) and Defendants Bates, Carson, Helwig, and Jennings' Motion for Summary Judgment (# 45). To the extent that this Order does not resolve the issues raised in Plaintiff's Motion To Strike Materials Submitted in Support of Defendants' Motions for Summary Judgment (# 56) and Defendants Johnson, Nichols, and the Board's Motion To Strike (# 62), the Court deems them **MOOT.** The Clerk of the Court is directed to enter judgment against Plaintiff and in favor of Defendants. This case is terminated.