No. 04-861

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 199

JOSEPH A. BAUMGARDNER, on behalf of
himself and all others similarly situated,

        Plaintiff and Respondent,

   v.

PUBLIC EMPLOYEES' RETIREMENT BOARD
OF THE STATE OF MONTANA,

        Defendant and Appellant.

APPEAL FROM:    The District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADV 2002-450,
Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            James H. Goetz, Goetz, Gallik & Baldwin, Bozeman, Montana

            Kelly Jenkins and Melanie Symons, Special Assistant Attorneys
General, Helena, Montana

        For Respondent:

            Ross W. Cannon, Cannon & Sheehy, Helena, Montana

            Thomas C. Morrison, Attorney at Law, Helena, Montana

Submitted on Briefs:  July 5, 2005

Decided:  August 16, 2005

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1      Joseph Baumgardner sued the Public Employees' Retirement Board of the State of Montana (the Board) alleging that House Bill 294, Act effective Mar. 29, 2001, ch. 149 § 1, 2001 Mont. Laws 696, 697 (H.B. 294), enacted by the 2001 Montana Legislature, unconstitutionally delegated legislative power; impaired the obligation of contracts in violation of Montana Constitution Article II, Section 31; and contained more than one subject in violation of Montana Constitution Article V, Section 11(3).   On cross-motions for summary judgment, the District Court concluded that H.B. 294 unconstitutionally delegated legislative power to the Board.  The Board appeals.  We reverse.

¶2      We restate the Board's three issues as follows:

¶3      1.  Is the District Court's decision that H.B. 294 unconstitutionally delegated legislative power to the Board a final decision from which the Board can appeal to this Court under Rule 1(a)(1), M.R.App.P.?

¶4      2.  If the District Court's decision is not a final decision from which the Board can appeal, will this Court consider the Board's brief as a petition for a writ of supervisory control under Rule 17, M.R.App.P.?

¶5      3.  Did H.B. 294 unconstitutionally delegate legislative authority to the Board?

¶6      Because the first issue disposes of the second issue, we decline to address the second issue.

## BACKGROUND

¶7 Baumgardner worked for the State of Montana for over thirty-six years before he retired in 2002. In 1994, the citizens of Montana passed Constitutional Amendment Number 25. 1995 Mont. Laws 3711. Now codified at Montana Constitution Article VIII, Section 15, that amendment constitutionalized the public retirement systems. A year before Baumgardner retired, the Legislature passed H.B. 294, which amended the definition of "actuarial equivalent" in § 19-2-303(4), MCA (1999), and increased the guaranteed annual benefit adjustment (GABA). H.B. 294 §§ 1, 3, 2001 Mont. Laws at 697, 705. Upon retiring, Baumgardner began receiving retirement benefits of $2149.98 per month. Before the amendment, Baumgardner would have received $2333.73 per month. By changing the definition of "actuarial equivalent," and increasing the GABA, the Legislature allowed the Board to decrease Baumgardner's benefits by $183.75. As a consequence, Baumgardner sued the Board.

¶8 H.B. 294 made two changes in the statutory scheme relevant to this appeal. It changed the definition of "actuarial equivalent" and increased the GABA from 1.5 percent to 3 percent. H.B. 294 §§ 1, 3, 2001 Mont. Laws at 697, 705. Before H.B. 294, § 19-2-303(4), MCA (1999) (amended 2001), provided that "'Actuarial equivalent' means a benefit of equal value when computed upon the basis of the 1971 Group Annuity Mortality Table, with ages set back 4 years and an interest rate of 8% compounded annually." H.B. 294 changed the definition to "'Actuarial equivalent' means a benefit of equal value when computed upon the basis of the mortality table and interest rate assumptions adopted by the board."

Baumgardner's benefits decreased as a result of the new definition of "actuarial equivalent" and the Board's determinations under that definition.

¶9      Section 19-3-1501 (2001), MCA, allows a retiree to convert his retirement benefit "into an optional retirement benefit that is the actuarial equivalent of the original benefit." Section 19-3-1501(1), MCA (2001); *see also* § 19-3-904, MCA (2001).  By changing the definition of "actuarial equivalent," H.B. 294 changed the method by which the Board ensures the benefits received under the different options are equal to the original benefit.  *See* §§ 19-2-303(4), 19-3-1501(1)(a) to (c), 19-3-904, MCA (2001).  Baumgardner chose Option 2, which provides for benefit payments to another person, a beneficiary, during her lifetime after the retiree's death.  Section 19-3-1501(1)(a), MCA (2001).  Because it is more likely that either the retiree or the beneficiary will be alive in a particular year (and receiving benefit payments) than it is likely that only the retiree, himself, will be alive in a particular year, an actuary expects the retiree and beneficiary to receive a larger number of benefit payments under Option 2.  Further, assuming that the retiree is entitled to a fixed amount of money, to make up for those additional payments in the future, the benefit payments in the present must be reduced.

¶10     The GABA, or guaranteed annual benefit adjustment, as it says, increases the benefit payments every year by a fixed amount regardless of inflation or other factors.  By increasing the GABA from 1.5 percent to 3 percent, benefit payments in subsequent years will be greater.  Again, assuming that the retiree is entitled to a fixed amount of money, to make up for those greater payments in the future, the benefit payments in the present must be lower.

4

This factor combines with the effect of the additional beneficiary. Thus, in the future, the retiree and beneficiary will receive not only a larger *number* of benefit payments; but also, with the increased GABA, larger benefit *payments*.

¶11 After the Legislature adopted H.B. 294, the Board began using an updated mortality table to reflect more accurately the life-spans of retirees and beneficiaries, and a gender blend to approximate, for every retiree and beneficiary, the aggregate effect of disparate gender life-spans.[1] Also, after H.B. 294, the Board began considering, for the first time, the ages of the retiree and the beneficiary at retirement in calculating the benefit payments. The combined effect of these changes decreased Baumgardner's benefits by $183.75 per month.

¶12 In response to cross-motions for summary judgment, the District Court concluded that, while H.B. 294 did not contain more than one subject in violation of Montana Constitution Article V, Section 11(3); it, nevertheless, unconstitutionally delegated legislative power. The Board petitioned this Court for a writ of supervisory control, which we denied.

---

[1] Title VII of the Civil Rights Act of 1964 § 703(a)(1), 42 U. S. C. §§ 2000e-2(a)(1) (2003) and the Equal Pay Act of 1963 § 3, 29 U. S. C. § 206 (d)(1) (2003), prohibit treating individual retirement system members disparately based on sex. *City of L.A. Dep't of Water & Power v. Manhart* (1978), 435 U.S. 702, 717, 98 S.Ct. 1370, 1380, 55 L.Ed.2d 657, 671, *overruled on other grounds by* 461 U.S. 951, 103 S.Ct. 2420, 77 L.Ed.2d 1310 (1983). Nevertheless, actuaries may use the male to female ratio in the entire force to determine the expected life span of a typical employee. *City of L.A. Dep't of Water & Power*, 435 U.S. at 718 n.34, 98 S.Ct. at 1380 n.34, 55 L.Ed.2d at 671 n.34. For a grossly simplified hypothetical, if 75 percent of the employees were male, with men expected to live 70 years, and with women expected to live 80 years, an actuary would expect a typical employee to live 72.5 years ($70 * 0.75 + 80 * 0.25 = 72.5$). The expected life span of a typical employee changes with the gender ratio. This method gives all employees the same benefits and responsibilities regardless of gender.

¶13    The Board then moved the District Court to certify the judgment as final pursuant to Rule 54(b), M.R.Civ.P.  The District Court granted the Rule 54(b) certification.  The Board appeals.

## STANDARD OF REVIEW

¶14    This Court reviews a district court's decision granting summary judgment de novo. *Montana Mountain Prods. v. Curl*, 2005 MT 102, ¶ 8, 327 Mont. 7, ¶ 8, 112 P.3d 979, ¶ 8. A district court properly grants summary judgment only when no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. *Montana Mountain Prods.*, ¶ 8. We conduct a plenary review of constitutional law questions.  *Crismore v. Montana Bd. of Outfitters*, 2005 MT 109, ¶ 11, 327 Mont. 71, ¶ 11, 111 P.3d 681, ¶ 11.

## DISCUSSION

### I.  Final Decision

¶15    Baumgardner argues that the Rule 54(b), M.R.Civ.P., certification was not proper because the District Court did not resolve all of the issues pending in the District Court.

¶16    When the District Court declared H.B. 294 unconstitutional, the other challenges to H.B. 294 were mooted and there was no further need for the court to decide whether H.B. 294 impaired the obligation of contracts in violation of Montana Constitution Article II, Section 31, or whether H.B. 294 violated Montana Constitution Article V, Section 11(3), by containing more than one subject.

¶17    We conclude that the Rule 54(b), M.R.Civ.P., certification was appropriate and the Board's appeal is properly before us.

6

## II. Unconstitutional Delegation

¶18 As shown earlier, the definition of "actuarial equivalent," changes the method by which the Board calculates the benefits under Option 2. The District Court decided that H.B. 294 gave the Board unconstrained discretion. It cited § 19-2-403(8), MCA (2001), which provides that, "[u]pon the basis of the findings of the actuary pursuant to 19-2-405, the board shall adopt actuarial rates and rates of regular interest *it determines appropriate* for the administration of the retirement systems." (Emphasis added.) Deciding that § 19-2-303(4), MCA (2001), gave the Board unconstrained discretion, the District Court concluded it violated the separation of powers in Montana Constitution Article III, Section 1.[2] The Board argues that Montana Constitution Article VIII, Section 15(2), gives the Board discretion to adopt new actuarial determinations. It cites *Duck Inn v. Montana State University-Northern* (1997), 285 Mont. 519, 526, 949 P.2d 1179, 1183, as an example of the Montana Constitution delegating powers directly.

¶19 Montana Constitution Article III, Section 1, provides:

> **Separation of powers.** The power of the government of this state is divided into three distinct branches—legislative, executive, and judicial. No person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.

Montana Constitution Article V, Section 1, provides:

---

[2]Curiously, the District Court's Decision and Order does not address Montana Constitution Article VIII, Section 15(2), which the Board raised in its Memorandum in Support of Motion to Dismiss.

7

**Power and structure.** The legislative power is vested in a legislature consisting of a senate and a house of representatives. The people reserve to themselves the powers of initiative and referendum.

Montana Constitution Article VIII, Section 15, provides:

**Public retirement system assets.** (1) Public retirement systems shall be funded on an actuarially sound basis. Public retirement system assets, including income and actuarially required contributions, shall not be encumbered, diverted, reduced, or terminated and shall be held in trust to provide benefits to participants and their beneficiaries and to defray administrative expenses.

(2) The governing boards of public retirement systems shall administer the system, including actuarial determinations, as fiduciaries of system participants and their beneficiaries.

¶20 In *Bacus v. Lake County* (1960), 138 Mont. 69, 77-82, 354 P.2d 1056, 1060-63, we relied on 1889 Montana Constitution Article IV, Section 1, in striking down a delegation of legislative power to an administrative agency. With minor stylistic changes, the current Montana Constitution Article III, Section 1, is identical to that 1889 section. Section 1 of Article III prohibits any branch from "exercis[ing] any power properly belonging to either of the others, *except as in this constitution expressly directed or permitted.*" (Emphasis added.) Generally, the Legislature has the legislative power, Mont. Const. Art. V, § 1, but Section 1 of Article III specifically allows another branch to exercise the power properly belonging to another branch if the Constitution expressly directs or permits.

¶21 In *Duck Inn*, we interpreted Montana Constitution Article X, Section 9(2)(a), which states:

The government and control of the Montana university system is vested in a board of regents of higher education which shall have full power, responsibility, and authority to supervise, coordinate, manage and control the

8

Montana university system and shall supervise and coordinate other public educational institutions assigned by law.

We decided that the Montana Constitution directly gave the Board of Regents authority—independent of any Legislature delegation. *Duck Inn*, 285 Mont. at 526, 949 P.2d at 1183. We concluded that that the phrase "full power, responsibility, and authority" gives the Board of Regents the authority to "rent[] its facilities to private persons and organizations for parties, reunions, conventions and receptions." *Duck Inn*, 285 Mont. at 521, 526, 949 P.2d at 1180, 1183. Similarly, Montana Constitution Article VIII, Section 15(2), states that the Board "shall administer the system, including actuarial determinations . . . ."

¶22    Baumgardner attempts to distinguish the powers allocated to the Board of Regents from the powers allocated to the Board by arguing that the delegation in Article X, Section 9(2)(a), giving "full power, responsibility, and authority" is broader than the words in Article VIII, Section 15(2), that only delegate the power to "administer the system." While the constitutional delegation to the Board of Regents may be broader, we hold that Article VIII, Section 15(2), is sufficiently broad to allow the Board to define "actuarial equivalent."

¶23    Baumgardner argues that the intent behind Montana Constitution Article VIII, Section 15, was to limit the retirement funds (1) to pay retirement benefits, (2) to pay to administer the system, and (3) to require the systems to be *funded* in an actuarially sound manner. He argues that the power to define "actuarial equivalent" does not fit any of these goals. This analysis absolutely ignores the textual mandate of Montana Constitution Article VIII, Section

9

15(2), which requires the Board to "administer the system, including actuarial determinations."

¶24 Montana Constitution Article III, Section 1, specifically allows one branch to exercise the power properly belonging to another branch if the Constitution expressly directs or permits. The Constitution does so in Article VIII, Section 15(2). Under the principles of *Duck Inn*, to the extent administering that system requires "actuarial determinations," Montana Constitution Article VIII, Section 15(2), gives the Board authority to make those determinations. In this case, the Board had the power to determine the actuarial methods by which to make Option 2 actuarially equivalent to the original retirement benefit in § 19-3-904, MCA (2001). Sections 19-2-303(4) and -1501, MCA (2001).

¶25 Because the Montana Constitution itself delegated the authority to the Board to make actuarial determinations, the District Court erred in concluding that the Legislature and H.B. 294 unconstitutionally delegated authority to the Board to make those actuarial determinations.

¶26 Reversed.

/S/ W. WILLIAM LEAPHART

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA O. COTTER
/S/ JIM RICE
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JAMES C. NELSON